

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

### NO. AP-76,580

---

### ALBERT JAMES TURNER, Appellant

### v.

### THE STATE OF TEXAS

---

### ON DIRECT APPEAL FROM CAUSE NO.10-DCR-054233
### IN THE 268TH DISTRICT COURT
### FORT BEND COUNTY

---

**KELLER, P.J., delivered the opinion of the Court in which KEASLER, HERVEY, ALCALA, RICHARDSON, YEARY and WALKER., JJ., joined. KEEL., J., dissented. NEWELL, J., did not participate.**

Appellant was convicted of capital murder for killing his wife and mother-in-law during the

same criminal transaction.[1]  The jury answered the special issues in such a manner that Appellant

---

[1] TEX. PENAL CODE §19.03(a)(7)(A); TEX. CODE CRIM. PROC. art. 37.071.  Unless otherwise indicated, all future references to articles refer to the Texas Code of Criminal Procedure.

was sentenced to death.[2] Direct appeal to this Court is automatic.[3] On original submission, we remanded this case for a retrospective competency hearing. We later ordered supplemental briefing on the effect, if any, of the Supreme Court's recent decision in *McCoy v. Louisiana*.[4] We now conclude that Appellant was competent to stand trial, but we also conclude that defense counsel conceded Appellant's guilt of murder against Appellant's wishes in violation of *McCoy*. Consequently, we reverse the trial court's judgment of conviction and remand the case for a new trial.

## I. Background

The day after Christmas of 2009, Appellant entered the home of his in-laws and killed his wife, Keitha Turner, and his mother-in-law, Betty Jo Frank, by cutting their throats. Four of Appellant's young children were at the house at the time, and two of them, K.T. and J.T., were eyewitnesses to the murders. Twelve-year-old K.T. called 9-1-1 and told the dispatcher that her grandmother was dead and her mother was dying and needed help. K.T. identified her father, Appellant, as the killer.

| K.T.: | Help. Help. Help! |
|---|---|
| 911 operator: | Hello? . . . Ma'am what's going on? |
| K.T.: | My Dad came in our house and, and he, he choked my mom and she's bleeding and there's blood everywhere! Please! Come! |
| | . . . |

---

[2] Art. 37.071, § 2(g).

[3] Art. 37.071, § 2(h).

[4] 138 S.Ct. 1500 (2018).

K.T.: Please help! My Grandmas dead. She's dead.

911 operator: Who is dead?

K.T.: My Grandma Grammy. He killed her too.

911 operator: I can't understand what you're saying.

K.T.: My Grandma is dead!

. . .

911 operator: What happened to her?

K.T.: He killed her!

911 operator: Who did that?

K.T.: My dad!

911 operator: What did he do to her?

K.T.: He stabbed her with something and her neck is cut open and she's dead!

. . .

Both of them . . . My mom and my grandma . . . We are all here and my Mom, [Unintelligible—screams], my mom is [Unintelligible—screams].

Appellant fled, and a nationwide manhunt ensued. He was apprehended in North Carolina two and a half months later, using an alias, after his photo appeared on the Regis and Kelly television show during a promotion of the 1,000th episode of "America's Most Wanted."

The testimony of K.T. and J.T. was taken via deposition before trial at the request of defense counsel. K.T. testified to a history of domestic hostility between her parents. K.T. recalled the events on the night her mother and grandmother were killed:

Q:      [By defense counsel]. Okay. Just tell me what you heard and what you did.

A:      [K.T.]. I heard my mom scream and I kind of hesitated at first but then I got out of bed and on my way to—to where my mom was sleeping and my grandma's room and I opened the door and I started screaming for them and my grandma came out and she grabbed the phone and came out and she stood on—on my left side and then my grandpa got up and was standing on my right side and that's right whenever my dad came around the corner.

        . . .

A:      He came out of my mom's room where my mom was sleeping.

        . . .

Q:      So you saw your dad?

A:      Yes.

K.T. said that she heard Appellant telling her grandma and grandpa to "shut up," before she watched him run down the stairs and heard him leave through the door.

Q:      Okay. And then what did you see?

A:      And then I—I just went to—where my mom was. I was in there and she was—she was bleeding in her neck, too, and holding it; and my grandma got up and she brought the phone to me and my—my mom said to call 9-1-1 and my grandma walked back to where she was and so I called 9-1-1 and I was just going back and forth between my grandma and my mom.

        . . .

A:      I was just still going back from my mom to my grandma; and then whenever I went to my grandma, she was laying on the ground; and I picked her back up; and she wasn't breathing; and so I checked her heartbeat; and her heart wasn't beating; and so then I went into my grandma's—my mom's room again with my sisters, but my mom told my sisters to go out of the room because she didn't want them seeing—want them to see her like that.

J.T. said that he saw Appellant come out of his mother's room with a knife in his hand and that he saw blood coming out of his mother's mouth.

## II. Competency

Appellant raised the issue of his competency to stand trial both at trial and on appeal. We remanded the case to the trial court, which held a retrospective competency hearing at which Appellant was found to have been competent at the time of his trial. Appellant has now filed a supplemental brief. In light of Appellant's claims, it is necessary to recount the evidence relating to his competency.

### A. Evidence Relating to Competency

### 1. Interactions with Counsel

Appellant's relationships with all members of his defense team were contentious throughout the proceedings.[5] This difficulty was caused, at least in part, by the fact that Appellant and his attorneys held different views about what defensive theory to pursue at trial. Appellant's attorneys decided to depose the children and then agree for the State to use the recorded deposition testimony at trial. In their view, this approach would be less damaging to Appellant than if the children testified live in front of the jury about the murders they had witnessed. After Appellant was told that his children would be deposed, communication between Appellant and his defense team turned permanently sour.[6]

---

[5] Ralph Gonzalez, Appellant's first attorney, withdrew from this case after Appellant physically threatened him. The trial court then appointed Tyrone Moncriffe and Patrick McCann to represent Appellant at trial, but their relationship with Appellant was antagonistic. Mr. Moncriffe testified at the retrospective competency hearing that, during one interview, Appellant accused him of poisoning Appellant's coffee. After Appellant was convicted, the trial court appointed the Office of Capital Writs (OCW) to represent him in habeas proceedings. Appellant was distrustful of the OCW and objected to its representation because it was a "state agency." The trial court granted the OCW's request to withdraw as counsel in January of 2012.

[6] At Appellant's motion for new trial hearing, McCann testified that "[Appellant] insisted
(continued...)

In May of 2010, Appellant's first trial attorney, Ralph Gonzalez, moved to have Appellant evaluated for competency to stand trial. Over the next year, Appellant was examined by several physicians. They all thought that Appellant exhibited signs of delusion, a genuine antagonism towards his defense team, and some signs indicating at least a possibility of paranoid thinking. None of them stated conclusively that, based on his mental capacity to rationally understand the nature of the proceedings against him, Appellant was incompetent to stand trial.

## 2. Physician Evaluations

Dr. Karen Gollaher, a psychologist, examined Appellant for competency to stand trial. In her report, she stated that Appellant was generally cooperative but that he would not discuss any of his actions on the night of the murders. She noted that Appellant "reported a belief that his wife had been having an affair for many years with the Mayor of Kendleton, Texas . . . [and] that this Mayor would repeatedly 'approach' him to say hello and he sometimes felt 'stalked.'" During the evaluation, Appellant denied experiencing any suicidal thoughts, homicidal thoughts, hallucinations, delusional thinking, beliefs about thought insertion, or a belief that someone could read his mind. Dr. Gollaher did not diagnose Appellant with any particular mental disorder. She ultimately determined that, although Appellant "made several statements that raise the possibility of paranoid thinking," his condition "[did] not undermine his ability to participate in the court procedures."

Dr. David Axelrad, a psychiatrist, evaluated Appellant and reported that he "[did] not demonstrate significant problems in his level of consciousness or in his orientation." Dr. Axelrad stated that Appellant "was cooperative during the psychiatric interview concerning his past history,

---

(...continued)
that, somehow, I was coercing the children off of camera."

but he did not wish to discuss any information concerning the commission of the alleged offense." He also noted that Appellant appeared to have "mild paranoid functioning" that might be contributing to the problems he was experiencing with his attorney. Dr. Axelrad ultimately concluded that Appellant was "presently mentally competent to stand trial . . . and competent to enter into plea negotiations concerning his alleged offense" in the event that he and his attorney could develop an effective working relationship.

Dr. Shawanda Williams-Anderson, a neuropsychologist, evaluated Appellant approximately six weeks before trial. Dr. Williams-Anderson "administered the MMSE, which is a 30-point assessment tool that measures orientation. [Appellant] scored twenty-eight out of thirty possible points, which is indicative of intact mental facilities." Dr. Williams-Anderson's evaluation focused predominately on Appellant's disruptive behavior and his ability to cooperate with his defense team:

> Because of the seriousness of [Appellant's] charges, his unwillingness to participate in his defense, and his extreme distrust of every member of his team, his competency to stand trial is questionable. His actions are directly impeding his defense team. He is making dire decisions that are detrimental to his defense and has no understanding of doing so. Thus, his mental capacity to stand trial is not the source of contention, but his ability to participate in the legal process was closely evaluated. [Appellant's] actions would deem him incompetent to stand trial.

In May of 2011, Appellant's defense team raised concerns that Appellant's mental state had deteriorated since these evaluations, and counsel moved for a formal competency hearing. The trial court ordered Dr. Connie Almeida, a licensed clinical psychologist and Director of Fort Bend County Behavioral Health Services, to evaluate Appellant to assess whether his level of competency had changed. Dr. Almeida was unable to reach a conclusion about whether Appellant's failure to cooperate with counsel rendered him incompetent to stand trial, but she stated that there had been "no significant changes in [Appellant's] emotional or cognitive functioning since the time of these

evaluations [by Drs. Gollaher and Axelrad] that would adversely impact his competency to stand trial at the present time." The trial court proceeded to trial without holding a formal competency hearing.

### 3. Trial

By the time of trial, Appellant's relationship with his defense team had turned acrimonious, in part because his attorneys pursued a trial strategy that discounted Appellant's explanation of the offense. Defense counsel contended that Appellant should admit his guilt and concentrate on obtaining a life sentence instead of the death penalty. In opening statements, his attorneys described the slaying of Keitha Turner as a crime of passion but argued that Betty Jo Frank's death was accidental. Defense counsel argued that the facts did not legally amount to capital murder, that Appellant was in a state of delusional denial about the crime he had committed, and that the proper verdict was the lesser-included offense of murder. If successful, this defense would have avoided the assessment of the death penalty.

Appellant, however, maintained that he was innocent and denied any involvement in the murders. Appellant said he believed that the Mayor of Kendleton, members of the Mayor's entourage, the Chief of Police, the trial judge, the State prosecutors, and even his own attorneys were all participants in a conspiracy to secure his conviction.

Shortly before trial, Appellant intimated that he would take the stand. Against his attorneys' advice, Appellant testified on his own behalf. He testified that he did not kill his wife and mother-in-law and that his daughter, K.T., misidentified him as the killer and was coerced into giving deposition testimony against him. Before and during Appellant's cross-examination, defense counsel reurged motions to hold a formal competency hearing. The motions were denied.

## 4. Remand

On original submission, fourteen of Appellant's twenty-four points of error involved claims that the trial court reversibly erred, or otherwise misapplied the law, by failing to conduct competency hearings at various stages of the proceeding in violation of Chapter 46B of the Texas Code of Criminal Procedure and the constitutional right to due process. We determined that the trial court did err on this issue.[7] We sustained his ninth point of error,[8] abated the appeal, and remanded the case to the trial court to conduct a retrospective competency trial if one was feasible.[9]

On remand, Appellant's counsel filed pleadings arguing that a retrospective competency trial was not feasible because Appellant was not presently competent to participate in such a trial. The State maintained that Appellant's present competency was irrelevant. It also argued that a retrospective competency trial was feasible because Appellant's trial attorneys and the prosecutors were all available to testify, the quality and the quantity of evidence available to review was substantial, and an insignificant amount of time had passed since the trial.

During a hearing before the trial court, Appellant's counsel requested a formal hearing to determine Appellant's present competency before proceeding to a retrospective competency trial.[10]

---

[7] *Turner v. State*, 422 S.W.3d 676, 696 (Tex. Crim. App. 2013) ("[T]his case presents one of the relatively rare instances in which there is at least *some* evidence from which it may rationally be inferred *not only* 1) that the defendant suffers some degree of debilitating mental illness, and that 2) he obstinately refuses to cooperate with counsel to his own apparent detriment, *but also* that 3) his mental illness is what fuels his obstinacy.") (emphasis in original).

[8] Appellant's point of error nine: "This Court should abate the appeal and remand to the trial court for a determination of Appellant's competency during trial."

[9] *Turner*, 422 S.W.3d at 696-97.

[10] This request was based upon the holding in *Greene v. State*, 264 S.W.3d 271 (Tex.
(continued...)

The trial court said that it had "no doubt" that Appellant was competent at trial, but in an abundance of caution, the court ordered that Appellant be examined for current competency by both an expert for the State and an expert for the defense.

The two experts were appointed, but Appellant refused to leave his cell, and they were unable to complete their evaluations. The trial court then issued a written order in which it determined that a retrospective competency trial was feasible and set a date for that trial.[11]

At a later hearing, defense counsel argued that the retrospective hearing was infeasible—not because of the unavailability of witnesses or evidence, but because Appellant could not participate due to his current incompetency:

> Our request is to have a hearing to determine if it's feasible or not . . . We were never given the opportunity to have a hearing to argue feasibility, also known as [Appellant's] current competency. We were never given the opportunity to bring forth exhibits and bring forth witnesses to argue: No, it's not feasible because he's incompetent.
>
> . . .
>
> He has to be restored to competency so we can have the retrospective competency trial that the Court of Criminal Appeals demanded.

The State took the position that Appellant's current competency was not required, and that the retrospective hearing was indeed feasible for all the reasons that typically go into that determination:

> All we're here for today is whether it's feasible to have a retrospective competency hearing, not what he's like today or tomorrow or 20 years from now. And the

---

(...continued)
App—San Antonio 2008, pet. ref'd), in which the court of appeals found it unfeasible to hold a retrospective competency trial because Appellant was incompetent and was "expected to remain incompetent for the indefinite future." *Id*. at 272.

[11] This was a signed copy of the State's proposed order which it had submitted on April 28, 2014, prior to the initial scheduling hearing.

grounds for that are quite simple. First of all, the passage of time, although that's not a critical thing; but it has not been a great passage of time. The State of Texas tries cases dealing with mental states that are seven or eight years old. Second, the quality and quantity of the evidence. The evidence they would have at the time of the competency hearing two and a half years ago is the very same ones they've got now: Pat McCann, Tyrone Moncriffe. They also have access to any other doctor they've got at that time. There is nothing, not one bit of evidence they do not have now that they didn't have back then. In fact, she said they had more . . .

. . .

The logic is he has to be competent to have an incompetency hearing is an Alice in Wonderland type logic. We would never try anybody then.

As to the feasibility of the retrospective hearing, the trial court said:

So we're right back to where we were on the original competency hearing or competency situation at the time of the trial which we're going to have the feasibility on is he still won't talk to any professionals, so I'm not—we're going in a circle. I want to give [Appellant] all his rights, but there's nothing that at this point that would change—that you've shown me that would change my position on a decision I've already made, that's it's feasible to have the retrospective competency hearing.

This hearing concluded without the trial court making any changes to its finding that a retrospective competency trial was feasible.

Nevertheless, when both parties later announced "ready" for the retrospective competency trial, the trial court said that, while it believed the hearing was feasible, it had concluded that the law required Appellant to be competent in order to proceed. Over the State's objection that there was no statutory or legal basis for the trial court to hold a jury trial on the matter, the court ordered a hearing to determine Appellant's present competency.

The State challenged this decision via writs of mandamus and prohibition filed in this Court. We stayed the proceedings, filed and set the State's petitions of mandamus and prohibition, and ordered the parties—and invited the trial court—to brief the following issues:

1.      Must a defendant be presently competent in order for a retrospective competency trial to occur?

2.      If so, does the trial court have the authority to require a jury to determine the issue of present competency?

The trial court responded that it had determined that a retrospective competency trial was feasible but that it had ordered that a jury determine Appellant's present competency before proceeding with the retrospective competency trial.   The trial court maintained that it had authority to have Appellant's present competency resolved by a jury.  Ultimately, we denied relief on the State's writs of prohibition and mandamus,[12] but on the same day we lifted the stay and ordered the trial court to proceed with a retrospective hearing.[13]

### 5. The Retrospective Competency Trial

A retrospective competency trial was later commenced, but it ended in a mistrial because a witness was improperly asked about Appellant's conviction for this offense.[14]  Another retrospective competency trial was held, at which Appellant chose not to be present in the courtroom.  The trial court ordered the proceeding to be televised live to Appellant in his jail cell and private means of

---

[12]  *In re State of Texas ex rel. Healey*, Nos. WR–82,875–01 & WR–82,875–02, 2017 Tex. Crim. App. Unpub. LEXIS 192, 2017 WL 915532 (Tex. Crim. App. March 8, 2017) (not designated for publication).

[13]  *Turner v. State*, No. AP–76,580, 2017 Tex. Crim. App. Unpub. LEXIS 196, 2017 WL 2571546 * 6 (Tex. Crim. App. March 8, 2017) (not designated for publication) ("Consequently, it is no longer necessary to determine whether Appellant is presently competent before undertaking a retrospective competency trial."); *Id*. at *6–7 (citing *Ex parte Watson*, 606 S.W.2d 902, 906 (Tex. Crim. App. 1980) (rejecting the applicant's argument that the trial court should have obtained a "jury finding as to the feasibility of holding the retrospective competence hearing," noting that the trial court's setting and taking other actions in preparation for the retrospective competency hearing showed that "the trial court made the necessary determination" of feasibility)).

[14] The prosecutor asked Appellant's trial attorney, Pat McCann: "That testimony, that was the deposition you took from them, I was able to use it to convict the defendant?"

communication to be available to Appellant and counsel.

The jury heard testimony from Appellant's trial attorneys, Tyrone Moncriffe and Pat McCann, and the examining physicians, Drs. David Axelrad and Karen Gollaher. Jill Stotts, one of the prosecutors at Appellant's trial, also testified. In 2010, Dr. Axelrad reported to the trial court that Appellant was competent to stand trial. At the retrospective competency trial, however, he testified that Appellant had suffered from a mental disorder that disabled him from effectively communicating with his attorneys. He said that he arrived at this new conclusion based on information that was not available to him at the time of trial:

> Dr. Axelrad: [Appellant] had the jealous type of delusional disorder and the persecutory type of delusional disorder. . . . The persecutory type of delusion disorder is the type of delusional disorder that generally, in mentally disordered offenders, if they have that disorder, that—that does create significant issues involving competency, particularly the leg of competency to stand trial that relates to being able to rationally cooperate with your counsel in preparation of your defense.
>
> . . .
>
> Ms. Martin: Knowing what you know now, do you believe [Appellant] was competent?
>
> Dr. Axelrad: No. What I know now, what I have reviewed, I'm testifying to this Court right now [ . . . ] that this defendant at the time was incompetent to stand trial. And if—and I would have provided that information to him with the information I have available to me now.

The State countered Appellant's attempts to establish incompetency by showing that he was able to effectively consult with counsel. The State supported this argument, in part, by offering evidence of Appellant's disagreement with his attorneys on the issue of whether to depose his children. The following exchange occurred between the State and Dr. Axelrad during cross-examination at the retrospective competency trial:

The State:     Did defense counsel say: "I consulted with the defendant about these matters?" Do you remember that?

Dr. Axelrad:   Yes, I remember him testifying to that, yes.

The State:     So they consulted with the defendant about taking the depositions?

Ms. Martin:    Objection; relevance.

Trial court:   Overruled.

Dr. Axelrad:   Yes, I think that you can safely conclude that both attorneys in the matter made their statements with the trial court that—that they were consulting with—with their client.

The State:     Did you see where they said they consulted with him about taking the deposition and that he agreed at one time to take the deposition but now he's changed his mind?

Dr. Axelrad:   Yes, that is true.

Apart from Dr. Axelrad's testimony, most of the evidence presented to establish Appellant's incompetency consisted of defense counsel's testimony about how difficult it was to represent him.[15] Tyrone Moncriffe stated that, during one interview, Appellant thought his attorneys were trying to poison his coffee. When asked what effect a defendant's decision to testify might have on the case, Moncriffe responded, "It depends on the strategy, but most times, it destroys your whole strategy,

---

[15] There is no evidence that Appellant was ever treated for any psychiatric disorder before the murders, and the State has argued that, throughout all of the competency proceedings and the retrospective competency trial, Appellant never presented any psychiatric or medical evidence of mental illness or mental injury. As a veteran of the first Gulf War, Appellant evidently suffered from two concussions, but those injuries were not linked to any kind of lasting mental defect or illness. A brain scan taken a week before trial did not reveal any detectable abnormalities. After the punishment phase of trial, Appellant's counsel withdrew a motion related to mental-health evidence in the jury charge because no such evidence was presented. Appellant's I.Q. is in the normal range. Appellant never presented any school record, service record, or employment record suggesting a diagnosis of any mental illness or mental impediment. He never presented any family member or friend who had observed in him a mental illness or mental defect.

destroys the case itself."  Pat McCann also testified:

Ms. Martin:    Now in this case, how does [Appellant's behavior] strike you different[ly] than just an obstinate client who's lying to you?

Pat McCann:   This was consistent over the course of several months.  There was no indication of humor.  There was no tale.  There was nothing to indicate that he had anything other than an absolute belief that I was part of some, for lack of a better term, white folk conspiracy to sit there and get, you know—do him harm.

Ms. Martin:    How did that impact your ability to represent him?

Pat McCann:   It made it impossible.  You could not have a discussion with him about what the evidence showed because he was in delusional denial.

On cross-examination, the following exchange occurred:

The State:     [W]e're not going to be talking about the facts of this particular case. We're not allowed to.  All the jury's going to decide is did he have the ability to consult with you, okay?

Pat McCann:   And he did not.

The State:     That's your opinion.

Pat McCann:   Based on eight weeks of sitting next to him and knowing crazy when I sit next to it.

The State called Dr. Gollaher, who had previously reported to the trial court that Appellant was competent to stand trial.  She said that, although "anything is always possible," she "didn't see any information to support" an inference that Appellant had "persecutory delusional disorder" or any other mental illness that rendered him incompetent to stand trial.  Dr. Gollaher testified before the jury about her interactions with Appellant during the months before trial:

Dr. Gollaher:  Both times I saw [Appellant], he was very cooperative.  He engaged in conversation with me.  Again, was—was guarded, as he should be, about Fifth Amendment right issues but was able to interact with me, was easy to develop rapport with, and so that made the evaluation

easy. He did not engage in any behavior that gave me concern about a mood disorder like significant depression—

. . .

The State: What about delusions or hallucinations? Was he suffering from any of those from what you could tell?

Dr. Gollaher: He did not engage in anything that made me think he had hallucinations, and certainly he denied that. We talked about specific examples or types of delusions, and he denied all of those. He did speak about some thinking that could be seen as paranoid. . . . He discussed concerns about his food, that people may be putting—I think it was fingernails or maggots into his food. . . . So those could be seen as paranoid; they could not be. They could be a reality.

. . .

The State: Did he ever use the word "poisoning, with poison?"

Dr. Gollaher: No, he did not.

Dr. Gollaher's testimony also supported the State's position that Appellant was not incompetent to stand trial just because he had a difficult relationship with his attorneys:

The State: And based on your overall interactions with [Appellant], as well as all these other items, did you believe that his statements about his defense team were logical or illogical?

Dr. Gollaher: They were logical. They seemed like rational statements someone might make.

The State:: And what were some of those statements?

Dr. Gollaher: His biggest concern appeared to be, from what I read, he was not happy with his representation. He was not happy with—[h]e wanted to be able to explain his side of the story; he wanted to be able to testify; he wanted certain evidence that he thought was really important to be entered. And he felt his attorney—attorneys were not listening to him and following through with that.
. . .

The State:    Did [Appellant] ever make any statements through the records that you were looking at that he believed that his defense team was working for the State?

Dr. Gollaher:  I believe he said that on at least one occasion.

The State:    Based on your training and experience and working with people when they're charged with crimes, is that a common belief that's shared when someone has a court-appointed attorney?

Dr. Gollaher:  Yes.

The State successfully argued that Appellant was able to effectively consult with counsel. After a two-day retrospective competency trial, the jury returned a unanimous verdict that Appellant was not incompetent to stand trial at any point in time between April 15, 2011, and June 7, 2011.

## B. Analysis

### 1. Legal Standard

It violates due process to put an incompetent person to trial.[16]  When a trial court errs in failing to conduct a competency hearing, the remedy is to abate the appeal and remand the cause to the trial court to conduct a retrospective trial if one is feasible.[17]  If a defendant is tried and convicted, but is later found to have been incompetent to stand trial, that trial is rendered invalid on due-process grounds.[18]  However, if on remand a retrospective competency evaluation is possible, and a defendant is found to have been competent to stand trial when he was convicted, the defendant's

---

[16] *Cooper v. Oklahoma*, 517 US. 348, 354 (1996); *Drope v. Missouri*, 420 U.S. 162, 171-72 (1975).

[17]  *Owens v. State*, 473 S.W.3d 812, 816 (Tex. Crim. App. 2015); *Hawkins v. State*, 660 S.W.2d 65 (Tex. Crim. App. 1983); *Brandon v. State*, 599 S.W.2d 567 (Tex. Crim. App. 1980); *Ex parte Harris*, 592 S.W.2d 624 (Tex. Crim. App. 1980).

[18] *Owens*, 473 S.W.3d at 816.

conviction remains valid and there is no due-process violation.[19]

A defendant's competency to stand trial is a question of fact to be determined by the appropriate factfinder, which, in this case, was a competency jury.[20] In a competency trial under Article 46B, the factfinder's task is to decide if the defendant, who is presumed to be competent, proves incompetency by a preponderance of the evidence.[21] In *Morris v. State*, we said:

> A person is incompetent to stand trial if the person does not have: (1) sufficient present ability to consult with the person's lawyer with a reasonable degree of rational understanding; or (2) a rational as well as factual understanding of the proceedings against the person. Evidence related to these issues includes whether a defendant can (1) understand the charges against him and the potential consequences of the pending criminal proceedings; (2) disclose to counsel pertinent facts, events, and states of mind; (3) engage in a reasoned choice of legal strategies and options; (4) understand the adversarial nature of the criminal proceedings; (5) exhibit appropriate courtroom behavior; and (6) testify.[22]

A reviewing court measures the propriety of a competency determination under the legal standard set out in Article 46B.003(a).[23]

### 2. Competency Claims on Original Submission are Moot

---

[19] *Id*.

[20] TEX. CODE CRIM. PROC. art. 46B.051. *See also Morris v. State*, 301 S.W.3d 281, 287 (Tex. Crim. App. 2009). Under the competency statute, the issue of competency is decided by the trial judge unless either party requests, or the trial judge on his own motion directs, that it be decided by a jury. TEX. CODE CRIM. PROC. art. 46B.051. We need not address whether the prohibition against waiving a jury in a death-penalty trial applies to a competency trial in a death-penalty case. *See* TEX. CODE CRIM. PROC. arts. 1.13(b), 1.14(a).

[21] TEX. CODE CRIM. PROC. art. 46B.003(b); *Morris*, 301 S.W.3d at 285.

[22] *Morris*, *supra* at 285–86 (internal quotation marks and citations omitted).

[23] *Id*. at 291 (citing *Whitehead v. State*, 130 S.W.3d 866, 872 (Tex. Crim. App. 2004) ("An appellate court's review of the record itself is generally limited to the evidence before the trial court at the time of the trial court's ruling.")).

Fourteen of the points of error Appellant raised on direct appeal claimed that he was incompetent to stand trial, or that the trial court should have stopped the trial at various points to conduct a formal competency hearing. Appellant's first eight points of error were resolved in his favor when we sustained his ninth point of error,[24] abated the appeal, and remanded this matter for a retrospective competency trial.[25] The allegations in points of error ten through fourteen in Appellant's original brief could be viable only if he were found incompetent. Given the jury's verdict that Appellant was competent to stand trial, the points of error related to competency in his original brief are now moot. We granted Appellant's motion for leave to file a supplemental brief after the retrospective competency trial, and he has raised seven points of error regarding that proceeding. We will address those issues next.

### 3. The Trial Court Followed Our Remand Order

In supplemental point of error six, Appellant argues that the trial court reversibly erred by conducting the retrospective competency trial without full and meaningful consideration of all aspects affecting the feasibility of the proceeding. Appellant complains that the trial court failed to follow our remand order by not conducting a hearing to consider each of the elements of feasibility. We do not agree with that interpretation of the record, and we find that the trial court did not err.

Our remand order directed the trial court to determine whether a retrospective competency trial was feasible. The State provided the trial court with a "Bench Memorandum on the Feasibility

---

[24] *See supra* at n.8.

[25] *See supra* at n.9.

of a Retroactive Competency Hearing,"[26] in which it listed evidence to show Appellant was competent during trial. The trial court appointed two physicians to evaluate Appellant's present competency, but Appellant refused to meet with them. The trial court determined that a retrospective competency trial was feasible and set a date for trial.

In his supplemental brief, Appellant does not say why the retrospective competency trial was not feasible based upon the evidence available to all the parties. Appellant instead complains that the trial court never held a hearing, suggesting that he was never afforded the opportunity to make any arguments against feasibility. But Chapter 46B does not require the trial court to hold a hearing on feasibility, and our remand order did not require the trial court to hold such a hearing. And even if Appellant were entitled to one, the record is replete with occasions on which all parties were present, in open court, to litigate this very issue. The topic of Appellant's present competency generally dominated the discussion on all occasions, and other evidentiary factors which may contribute to a feasibility determination remained uncontested.

The parties litigated the feasibility issue for nearly three years. While this case was on remand, Appellant's claim that he was presently incompetent created the only impediment to proceeding with the retrospective competency trial. The record indicates that the trial court had already determined that a retrospective competency trial was feasible but was awaiting guidance from this Court as to whether it first needed to make a determination about Appellant's present competency. The parties' conduct during this time confirms as much. The feasibility issue was argued in open court on at least three different occasions, and while the parties consistently debated

---

[26] The State notes in its brief that it mistakenly referred to the retrospective competency trial as a "Retroactive Competency Hearing."

the relevance of Appellant's present competency, Appellant never rebutted the State's position that a retrospective competency trial was feasible based on the passage of time or the quality and quantity of evidence. Even on the mornings of the retrospective competency trials, Appellant's objections were based upon claims of present incompetency. We find no error in the manner of the trial court's feasibility determination, and we overrule Appellant's sixth supplemental point of error.

### 4. The Retrospective Competency Trial was Feasible and Possible

In supplemental point of error seven, Appellant argues that the trial court reversibly erred by conducting a second retrospective competency trial that was not feasible and that violated his constitutional right to due process. Appellant argues that due process prohibits the jury from hearing the facts of the case, but the facts of the case were necessary to show that Appellant was incompetent. Appellant does not appear to argue that he was prohibited from introducing specific evidence. He claims instead that, in this case, the process itself was inherently unworkable. For instance, he argues that in order to find he was incompetent, the jury needed to hear that Appellant thought the Mayor of Kendleton had hired someone who looked like him to commit the double homicide, but such evidence would reveal "the devastating facts of the offense."

But the purpose of the retrospective competency trial was to determine Appellant's ability to *effectively consult with counsel*; it was not designed to measure the scope of Appellant's delusions about the offense. And that determination—whether Appellant was able to sufficiently consult with counsel—could be made without consideration of the facts of the case. No one argued that Appellant lacked a rational understanding of the proceedings against him.[27] The disputed issue was

---

[27] At the first retrospective competency trial, for example, when asked whether Appellant knew "about what was happening" and was "aware of the proceedings," Appellant's attorney

(continued...)

whether Appellant maintained the ability to effectively consult with his attorneys. The arguments presented to the jury involved a comparison of Appellant's desired trial strategy with the strategy that defense counsel pursued at trial. What the record now shows, and what the State established at the retrospective competency trial, is that Appellant did not lack the ability to consult with counsel. Appellant was able to communicate with his attorneys; he just disagreed with their trial strategy.

Both parties secured the testimony of important witnesses for the retrospective competency trial. The jury heard from Drs. Axelrad and Gollaher, and their testimony was subject to cross-examination. Appellant's trial attorneys were the leading advocates of Appellant's incompetency, and both were available to testify. Appellant's initial disclosure of expert witnesses also included the names of five competency experts, some of whom had previously testified in the proceeding. Both of the forensic mental health experts who eventually testified at the retrospective competency trial were familiar with Appellant's case based on their prior evaluations. Appellant's retrospective competency trial occurred about six years after he was convicted. There is no hint that the quality or quantity of the evidence had materially changed from the time of trial in a manner that undermined the feasibility of the proceeding.[28] Given the passage of time and the availability of experts, Appellant had more evidence than before to support his claim of incompetency.

Defense counsel claims that it violated his right to due process to be forced to choose whether to offer evidence of incompetency that revealed the brutal facts of the case. We believe, though, that

---

(...continued)
responded that "He [Appellant] was always clear about what my role was, Mr. Felcman's [Prosecutor] role, the Judge's role in these proceedings."

[28] *See Pate v. Robinson*, 383 U.S. 375 (1966) (remanding defendant's case to the district court for a competency hearing six years after his conviction).

whatever the difficulties of making such a choice, they did not cause a violation of due process. The trial court did not err in conducting the retrospective hearing. We overrule Appellant's seventh supplemental point of error.

### 5. Appellant's Motion for Mistrial

Appellant argues his first four supplemental points together. In supplemental points of error one and two, he alleges violations of Article 46B and due process because the trial court denied his motion for mistrial and allowed a juror to remain on the jury when, as a panel member, the juror had researched Appellant's case on the internet and texted a related news article to his wife. In supplemental points of error three and four, Appellant alleges violations of Article 46B and due process because the trial court refused to poll the venire panel and did not question seated jurors to determine if they had learned about the facts of the case.

### (A) Facts

During a lunch break after the jury was sworn, one of the seated jurors, Garcia, informed the bailiff that he had Googled Appellant's name during the lunch break. When the parties returned to the courtroom, the trial court noted that "Apparently we have a juror who did a little research on his own." The trial court asked Garcia what he had done:

> Garcia: Well, I was—after we—said take 20 minutes to go to the restroom, I went outside. I just Googled the name of the defendant and the name of the case. And then we came back in, and we sat down. When we sat down, they called the 12 names that got on the stand. And when we went to the other room, I told [the bailiff] that I Googled his name.

> Trial Court: Just exactly what did you find out about the case?

> Garcia: Well, I just saw a news report from the news from ABC 13 in 2011, I think it was, that he had just committed a murder. And then I just

glanced at it and—

Trial Court: You didn't read the whole article?

Garcia: No, I glanced at it.

Trial Court: You understand, sir, that these proceedings today have nothing to do with that trial—

Garcia: Right.

Trial Court: —that we're focused on a very specific issue. Are you going to be able to set aside what you found out in that Google—what you saw on Google and be able to make your decision based on the evidence you hear in this proceeding and answer the questions that are submitted to you?

Garcia: Yes, sir.

Trial Court: All right.

Garcia: Yeah, I just wanted to make the Court aware that I Googled.

Trial Court: Okay.

Garcia: When you made a comment about Googling, I Googled before I knew it was a—

Trial Court: Well, you know you can't do that anymore?

Garcia: Right.

Trial Court: All right. And you know that the facts that we raised today may not have been on anything you saw or heard, and it has nothing to do with that. You're able to set that out of your mind?

Garcia: Yes, sir, it was like from 2011. It was old.

The trial court then allowed the parties to question Garcia:

Ms. Martin: Are you aware if anybody else did the same thing? Did you see anybody else Googling?

Garcia:        No, ma'am.

Ms. Martin:    Did you talk about the facts of the case with anybody else?

Garcia:        Now, I just texted my wife. I said hey, I'm about to go back into the case, this is the case, I'm about to find out if I get picked.

Ms. Martin:    So you texted the name of the defendant?

Garcia:        Well, I sent her this article. I glanced at it. I had my phone. I texted my wife, said, hey, I might get picked because I—I had work stuff. And I said, hey, I'm about to go in. This is the case . . . Then I came in here, sat down five minutes later and got picked.

Ms. Martin:    And I appreciate—I think we all appreciate the fact that you went and talked to the bailiff about it. So can you tell me what you know about [Appellant] from—from glancing at the article?

Garcia:        It was just looking at the headline. It was like he murdered somebody. And then according to the thing—and I almost thought it wasn't the case. It said in the end he was convicted in 2011 or awaiting, I guess, sentencing.

Ms. Martin:    Why didn't you think it was him?

Garcia:        Well, I mean, I wasn't positive. I thought it was him. And I was like, well, it's done. And then I put the two together, well, then we're going back to that case.

Ms. Martin:    Oh, because when we talked about it being retrospective?

Garcia:        Right, right.

Ms. Martin:    Okay. So now you feel confident that that was the case?

Garcia:        Well, yeah, because I'm here.

Ms. Martin:    Okay. Yeah. Good point. Okay. So now you know he was convicted of murder?

Garcia:        Right.

Ms. Martin:    Okay. And he—You don't know what his punishment was?

Garcia: No, because all I saw was about the typical—Because I saw the title, you know, as you do most of the articles. You know, I kind of glanced through it, and went to the very end and—I saw the headline with "ABC 13" printed on it, and it said "Richmond, Texas." Another thing it said, I went down, glanced, it said murder or something. Scrolled down quickly. Went down to the bottom. And it said "convicted, awaiting sentencing." And that was it.

Ms. Martin: That was it? No other kinds of other issues about sentencing or anything?

Garcia: No.

Ms. Martin: No mention of who he killed?

Garcia: His mother, I want to say. And that was—

Ms. Martin: Okay. Did it mention any witnesses?

Garcia: No. Like I said, I didn't read down at the end. I just read the top, glances, typical, you know, to the bottom.

Ms. Martin: So convicted of murder, it was his mother, waiting for punishment, happened in Richmond, Texas? That was it?

Garcia: Yes, ma'am, that I can remember, that I can recall.

. . .

The State: Mr. Garcia, the question really on this is can you set aside what you just read and just decide whether this defendant—okay—had the ability to consult with his attorney? That's the only issue here before you today.

Garcia: Right, well, I'm going to have to. That's my duty.

The State: Huh?

Garcia: That's my duty, to put it aside, so yes.

The State: How would it affect you—How would it affect you, what you know, in answering that question of whether he was able to consult with his attorney? Is it going to affect you, or how would it affect you?

Garcia:  Well, before I hear anything, obviously, you glance at it, he's been convicted, but not knowing—knowing that you're saying something else, it shouldn't affect me.

The State: The Judge needs to know how it's going to affect you, if it's going to affect you in answering the questions. Because when you get down to the point of—okay. Defense counsel says we cannot try people who are incompetent. You understand that?

  . . .

Garcia:  Right.

The State: But you know what from this article about what—How does that tie in between the two?

Garcia:  Well, you look at the article, I mean, it's just not—He's obviously found guilty, so it's not going to be about him being guilty. So what I assume is he's already guilty. We're going to find out whether he was competent during that process. And that's the way I'm understanding. We're not going back to that case. It's not like we're reopening the case. It's just something different. That's why it wasn't even relevant because it's not what we're doing.

The State: Not relevant. Not relevant to your issue—

Garcia:  Right.

The trial court then heard arguments on whether to grant a mistrial:

Ms. Martin: The question "Can you set it aside" is insufficient in this context. We have to have a separate jury to prevent facts like that interfering with the decision of competency . . . I would also request if the Judge does—if the Court keeps the juror on, which I object to and absolutely motion to have him removed, to question all the other jurors and see if they did the same thing.

Trial Court: Mr. Felcman?

The State: Me and you have been through a lot of trials. We know the serious nature of this, but the simple fact is when you deal with these kind of things in a small community, people will know. He shouldn't have gone ahead and got on the Google. I understand that. But the fact

that he knows something about the case, the question is: Is he able to set that aside, first of all. She says he does not. But he also articulated he's here for a very specific purpose. He understood exactly what he's here for, to decide whether he was competent and could he consult with his attorney at that particular time. And he said it didn't matter to him or he did not think it was a relevant fact that he was convicted of it. Therefore, I do not know if you could ask more from a juror . . . I can understand [defense counsel's] motion. I can understand it. But on the other hand, is it really necessary in this particular case when he's gone ahead and articulated he knows why he's here, that the fact he was convicted, he could set that aside and knows that doesn't have anything to do with whether he was able to consult with his attorney. I don't know if you could ask any more from another juror.

Ms. Martin:  He knows that he was convicted. We had a mistrial [in the first retrospective competency hearing] because the jury found out he was convicted from the questioning of Pat McCann. His conviction is one of the core things that we were trying desperately to dance around. . . . There's—There is nothing more in terms of what a competency jury isn't supposed to know. And it goes back to we're already in a danger zone. . . At the very least . . . we need to question the other jurors on this panel. There is no way this taint can be mitigated. There's a problem with this case. There's no way.

Trial court:  All right. I'm going to deny your motion for a mistrial. The juror's convinced me that he can set aside the information he has gathered and understands that he's focused on only one issue and one issue only, and that's competency. It's denied. And, [bailiff], when you took the jurors back, did you—any of them indicate that they had done any research or had any conversation about—about the case or anybody had had a conversation with him about the case?

The bailiff:  No, sir, there was none. No.

Trial Court:  Okay. I'm satisfied. All right. Let's bring the jury in for the opening statements.

### (B)   Analysis

A mistrial is an appropriate remedy in extreme cases for a narrow class of highly prejudicial

and incurable errors.[29] We review the evidence in the light most favorable to the trial court's ruling, and consider only those arguments before the court at the time of the ruling.[30] The trial court's ruling must be upheld if it was within the zone of reasonable disagreement.[31]

A mistrial is not necessarily the correct remedy when jurors come to learn about a defendant's case in a competency trial. We have said:

> The purpose of a separate hearing before a different jury is to allow determination of competency of the defendant to stand trial uncluttered by evidence of the offense itself. . . . Evidence of the crime may adversely affect the jury's determination of the defendant's competency to stand trial by confusing the jurors or prejudicing them against the defendant. Not every mention of the crime itself will be prejudicial; to necessitate reversal evidence of the offense brought to the attention of the competency jury must be of such nature as to deny the accused a fair trial and impartial determination of his competency.[32]

In *Barber*, the entire jury learned that the defendant had been convicted of capital murder when, on cross-examination, a State's witness gave defense counsel a non-responsive answer that involved the nature of Barber's offense.[33] We held that the mere mentioning of the nature of the crime for which defendant was convicted was not sufficiently prejudicial to warrant reversal.[34] The same concept must apply in this case where only one juror glanced at an old internet article but did not share that information with any other juror.

---

[29] *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004).

[30] *Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004).

[31] *Id*.

[32] *Barber*, 757 S.W.2d 359, 361 (Tex. Crim. App. 1988).

[33] *Id*. at 362.

[34] *Id*. at 361–62.

Further, a mistrial is not required if the trial court is convinced that a juror will ignore any outside information received.[35] The challenged juror clearly articulated his understanding that the internet article about Appellant's case was irrelevant to the competency determination. Any juror who can put aside any bias, prejudice, or conclusion of guilt and base his verdict on the evidence presented in court may serve on the jury in the trial court's discretion.[36]

We also find that the trial court did not abuse its discretion by refusing to poll the jurors.[37] After the jurors were empaneled and sworn, the trial court instructed the jurors:

> Do not discuss this case with anyone or allow anyone to discuss this case with you. That includes by electronic means: Facebook, Twitter, looking up things on the computer, telephone calls, newspaper articles, or any other means by which people may communicate with you or you may communicate with them.

Appellant asserts that Stephen Doggett, an attorney who was watching the proceedings, informed defense counsel that he had seen people Google on their phones during the break. Defense counsel raised this concern to the trial court, and the court responded that it would decide whether to poll the jury if and when Doggett testified about his observations. Doggett, however, never testified before the trial court about his observations of the jurors.

The trial court refused to poll the jury, but it did instruct the prosecutors to monitor the social

---

[35] *See e.g.*, *Bustamante v. State*, 106 S.W.3d 738, 743–44 (Tex. Crim. App. 2003) (mistrial not required when jurors are given an effective instruction to disregard outside information); Art. 35.16(a)(10) ("[I]f the juror states that the juror feels able, notwithstanding such opinion, to render an impartial verdict upon the law and the evidence, the court, if satisfied that the juror is impartial and will render such verdict, may, in its discretion, admit the juror as competent to serve in such case.").

[36] *Barber*, 737 S.W.2d at 829–30.

[37] *See Mays v. State*, 318 S.W.3d 368, 376–78 (Tex. Crim. App. 2010) (holding that it was not an abuse of discretion for the trial to refuse to poll the jurors about their potential exposure to media coverage of the case).

media accounts of the jurors. District Attorney Investigator Matthew Cardenas testified that he located several of the jurors' social media accounts and that he did not find "anything at all that would show them posting any particulars about the court case or any case for that matter." It was Appellant's burden to show that any of the jurors were engaged in improper conversation about the case.[38] He failed to do so, and it would be improper to infer any error from this record. Consequently, we conclude that the trial court did not abuse its discretion in denying Appellant's motion for mistrial and in denying his request to question the other jurors. Appellant's supplemental points of error one through four are overruled.

### 6. The Jury Charge

In supplemental point of error five, Appellant claims that the jury charge impermissibly limited the time period during which he was required to be competent in violation of his right to due process. The trial court held a charge conference at the close of evidence, and Appellant objected to the date range contained in the jury charge: April 15, 2011 through June 7, 2011. Defense counsel argued that the correct date range should have been March 30, 2010, when counsel was first appointed to the case, through the hearing on Appellant's motion for new trial on August 8, 2011.

Appellant argues that the record "reflects evidence of incompetency from nearly the outset of the case," when his first-appointed attorney filed a motion for a competency evaluation in May of 2010. Appellant contends that the issue of incompetency was continually raised to the court long before April 15, 2011, and that his incompetency spanned a longer period of time than the two-month period the jury was permitted to consider in rendering its verdict. Therefore, he claims, the

---

[38] *See Ex parte Watson*, 606 S.W.2d 902, 906 (Tex. Crim. App. 1980) ("[I]t is the defendant's burden to establish that the conversation between a non-sequestered juror and another concerned the case at trial.").

time period in the jury charge should have reflected a broader time span. Appellant relies on *Drope* for the proposition that a defendant must be able "to consult with counsel, and to assist in preparing his defense."[39] While the rule pronounced in *Drope* is perfectly clear that a defendant must be competent to stand trial, we do not find any authority to support Appellant's argument that a defendant must be competent throughout pretrial proceedings, or that a jury charge at a competency trial must encompass that time frame.

Chapter 46B authorizes a jury trial on the issue of competency only to determine an individual's competency "*to stand trial* on the merits."[40] The statute does not require a specific time period for which a defendant must have the requisite "sufficient present ability to consult" with counsel other than the time of trial:

(a)     A person is incompetent *to stand trial* if the person does not have:

(1)     sufficient present ability to consult with the person's lawyer with a reasonable degree of rational understanding; or

(2)     a rational as well as factual understanding of the proceedings against the person.

(b)     A defendant is presumed competent *to stand trial* and shall be found competent to stand trial unless proved incompetent by a preponderance of the evidence.[41]

The expressed reason for a 46B proceeding is to protect a defendant's right to be competent during his trial, and that is exactly what the jury determined. We find no error in the jury charge, and we overrule Appellant's fifth supplemental point of error.

---

[39] *Drope*, 420 U.S. at 171.

[40] Art. 46B.005(b) (emphasis added).

[41] Art. 46B.003 (emphases added).

### III. Defense Counsel's Concession of Guilt

### A. Facts

As we explained in connection with the competency issues, Appellant's relationship with his defense attorneys was contentious. The acrimony was partly due to the attorneys' desire to depose Appellant's children, but it was also in part due to the attorneys' conclusion that Appellant's interests were best served by conceding that he killed the victims.

### 1. Pretrial

Before trial, Appellant asked the trial court to change his defense team because he felt that he was "being avoided and not defended." Appellant raised a number of complaints that we need not detail here, except to say that Appellant was in part disputing the attorneys' mitigation investigation. One of his attorneys, Patrick McCann, responded that Appellant "does not have a voice overriding ours and tactics. His rights are to decide whether to plea and to testify." McCann further contended that "mitigation is a critical component of any death capital case and we would be remiss in our constitutional duties were we not pursuing that. I certainly understand that Mr. Turner has views on these matters; however, those matters and his views are not and do not comport with our obligations under the law." Near the conclusion of the hearing, Appellant told the trial court, "I don't want them representing me," but said that he did not have the means to hire an attorney of his choice. In a later pretrial hearing, the trial court summarized an affidavit by one of the defense attorneys as revealing an attitude by Appellant that "is consistent with the attitude that [he] has displayed throughout these proceedings regarding his Defense Counsel."

### 2. Opening Statements

During opening statements, defense attorney McCann told the jury that he expected the

evidence to show that Appellant killed his wife in a "jealous rage" but that the killing of his mother-in-law was not intentional. McCann argued that, although guilty of "two terrible horrible crimes," Appellant was not guilty of capital murder.[42] McCann also told the jury that Appellant "doesn't like me very much," and McCann made it clear that Appellant disagreed with his attorneys' decision to concede that Appellant killed the victims: "And if you look at him there, he's a large man, as he sits there scowling at me. Because he can't admit what he did, to himself or anybody else."

### 3. Appellant's Testimony

Against his attorneys' advice, Appellant insisted on testifying. When the questioning began to focus on what happened the day the victims were killed, McCann expressed the concern that ethics prevented him from continuing with Appellant in question and answer format. The prosecutor objected to Appellant being allowed to give a narrative response and urged McCann to pass the witness. McCann insisted on trying to proceed, and Appellant eventually testified that he did not kill the victims[43] and that the victim's deaths were a result of a conspiracy involving his wife having an affair with the mayor.

On cross-examination, the State asked Appellant if he had heard that his attorney had told the jury that Appellant killed his wife but that the grandmother's death was an accident. Appellant responded, "And I wanted to object to it." Before Appellant could respond further, the prosecutor

---

[42] McCann testified at Appellant's motion for new trial hearing about the defense strategy pursued at trial:

> We believed the only viable, honest strategy was to go where the evidence took us, which was that clearly [Appellant] was involved in the killings, and despite his constant exhortations to us to go find the real killers, we believed we had a good faith argument for a lesser included offense at the time . . .

[43] Appellant maintained that he was not at the house when the victims were killed.

cut him off and asked if he had heard it, and Appellant responded that he had. The prosecutor stated that Appellant just thought "these two attorneys should get you off for killing two women; therefore you're mad at them." The trial court sustained an "argumentative" objection to the prosecutor's question, but Appellant responded to the question by saying, "I didn't kill two women."[44] The prosecutor further asked if Appellant would agree that his attorneys were trying to save his life, and Appellant responded, "No." When pressed further on the issue, Appellant testified that he asked the defense attorney what he was going to say in opening statement because they had not been communicating, and he complained that his attorneys were not investigating his allegations about the mayor.

The prosecutor then pressed Appellant on his conspiracy theory about the mayor:

| | |
|---|---|
| The State: | Do you know they talked to the mayor? |
| Appellant: | That's what they told me. |
| The State: | I know. Everybody did. |
| Appellant: | And I've, you know—I looked at the thing. He was obviously lying. |
| The State: | Do you know these two gentlemen have tracked everything you have ever said down? |
| Appellant: | No. |
| The State: | And it comes to one conclusion: You killed those two women. |
| Appellant: | I didn't kill anyone. |
| The State: | And they're trying to save your life. You understand that? |
| Appellant: | I didn't kill anyone. |

---

[44] The trial court admonished Appellant to wait until the court ruled on an objection, and Appellant responded, "I was just focused. I'm sorry. I was just focused on his questions."

Appellant claimed that his daughter mistakenly identified him as the perpetrator and that the murders were the result of a conspiracy involving the mayor. At one point during this questioning, McCann objected, "Clearly, my client has gone into a paranoid state that is beyond ridiculous at this point." Later, when the prosecutor asked if Appellant wanted to change any of his story and "beg for forgiveness," Appellant replied, "I didn't kill anyone."

On redirect examination, McCann asked: "Mr. Turner, in your mind, all that drivel was true, wasn't it?" Appellant responded: "It is true."

### 4. Before Closing Arguments

On the morning of final arguments during the guilt stage of trial, Appellant announced to the trial court that he was "firing my defense team and representing myself" because his attorneys had "seriously neglected my case." The trial court ordered McCann to respond directly to Appellant's complaints. McCann responded:

> I understood him [Appellant] to mean that he rejected the theory that it was an accident because his testimony indicated he was not there. The only plausible defense that [we] could see coming from the evidence that we examined is that the second killing—while the first killing may have been an act of passion between a jealous husband and wife, the second killing would appear to have been unintended.

McCann concluded that this was "our conclusion and our best trial strategy, given the guilt/innocence facts as they emerged from lengthy investigation on both sides."

A discussion of Appellant's grievances against his attorneys continued. At the end of this discussion, Appellant stated, "That's it. I've fired him. It's not his decision." The trial court responded that it was also not Appellant's decision and that the trial court was denying Appellant's motion. Appellant responded, "I expected you to do that."

### 5. Jury Charge

Defense counsel requested the submission of the lesser-included offenses of murder, felony murder, and manslaughter. The trial court denied these requests, and the jury charge presented only the charged offense of capital murder.[45]

### 6. Closing Argument

In closing argument, McCann again conceded that Appellant was the killer. McCann stated that Appellant "snapped," that he "still hasn't accepted what has happened," and that the jury "actually got to watch what he [Appellant] thinks is the truth because he literally cannot accept what happened." McCann further expounded that "[i]n his mind, very sadly, it is the truth." Deprived of a lesser-included-offense instruction, McCann nevertheless argued that Appellant was not guilty of capital murder because the killing of the second victim was not intentional.[46]

### B. Analysis

### 1. *McCoy*

In May of 2018, the Supreme Court of the United States issued *McCoy v. Lousiana*.[47] We ordered additional briefing from the parties to assess what impact the decision had on the present case, and we now conclude that it controls.

---

[45] In denying the request, the trial court remarked:

And I've weighed it very carefully in my mind, the evidence that has been presented and your arguments. And while I was initially open to including a lesser-included of murder, after careful review of the evidence in this case and the argument of counsel and what the Court perceives the theory of defense counsel to be, I don't believe it lends itself to a lesser-included offense. Therefore, I'm going to deny your request.

[46] The jury charge instructed, "A person commits capital murder if he intentionally or knowingly causes the death of more than one individual during the same criminal transaction."

[47] *See supra* at n.4.

Robert McCoy was charged with first-degree murder for killing the mother, stepfather, and son of his estranged wife.[48] The prosecutor gave notice of intent to seek the death penalty.[49] Before trial, his attorney concluded that the evidence against McCoy was overwhelming and that, absent a concession at the guilt stage that McCoy was the killer, a death sentence was inevitable.[50] When told that the attorney planned to concede McCoy's commission of the murders, McCoy was furious and told his attorney "not to make that concession."[51] Nevertheless, in opening statement, McCoy's attorney proceeded to concede that McCoy had caused the victims' deaths.[52] McCoy protested, and out of earshot of the jury, told the trial court that defense counsel was "selling [him] out."[53] Defense counsel was allowed to proceed, and he told the jury that the evidence was "unambiguous" and that the defendant had "committed three murders."[54] He argued, however, that McCoy did not have the requisite mental state to warrant a first-degree murder conviction and was guilty instead of the lesser-included offense of second-degree murder.[55]

---

[48] *McCoy*, 138 S. Ct. at 1505-06.

[49] *Id.* at 1506.

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] *Id.*

[54] *Id.* at 1507.

[55] *Id.* at 1506 n.1, 1509; *Id.* at 1512, 1517 (Alito, J., dissenting) ("English did not admit that petitioner was guilty of first-degree murder. Instead, faced with overwhelming evidence that petitioner shot and killed the three victims, English admitted that petitioner committed one element of that offense, i.e., that he killed the victims. But English strenuously argued that petitioner was not guilty of first-degree murder because he lacked the intent (the mens rea) required for the offense."
(continued...)

Testifying at trial, McCoy maintained his innocence and presented an alibi that was "difficult to fathom."[56] He claimed that the victims were killed by the local police and that he had been framed by a farflung conspiracy of state and federal officials, reaching from Louisiana to Idaho, and including his attorney and the trial judge.[57] The jury convicted him of first-degree murder and sentenced him to death.[58]

The Supreme Court reversed McCoy's conviction and remanded the case for a new trial.[59] The Court held that the Sixth Amendment guarantees to a defendant "the right to insist that counsel refrain from admitting guilt, even when counsel's experience-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty."[60] The Court further stated, "When a client expressly asserts that the objective of '*his* defence' is to maintain innocence of the charged criminal acts, his lawyer must abide by that objective and may not override it by conceding guilt."[61] The Court explained that maintaining one's innocence is an objective of representation, not merely an issue of trial tactics, and thus is a decision reserved for the client, not the attorney:

> Trial management is the lawyer's province: Counsel provides his or her assistance
> by making decisions such as what arguments to pursue, what evidentiary objections

---

(...continued)
The attorney admitted the defendant's guilt of "a lesser included offense"—"that petitioner was guilty of the noncapital offense of second-degree murder in an effort to prevent a death sentence.").

[56] *Id.* at 1507.

[57] *Id.* at 1513 (Alito, J., dissenting).

[58] *Id.* at 1507.

[59] *Id.* at 1512.

[60] *Id.* at 1505.

[61] *Id.* at 1509 (citing U.S. CONST., amend. 6) (emphasis in *McCoy*).

to raise, and what agreements to conclude regarding the admission of evidence. Some decisions, however, are reserved for the client—notably, whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal. Autonomy to decide that the objective of the defense is to assert innocence belongs in this latter category. Just as a defendant may steadfastly refuse to plead guilty in the face of overwhelming evidence against her, or reject the assistance of legal counsel despite the defendant's own inexperience and lack of professional qualifications, so may she insist on maintaining her innocence at the guilt phase of a capital trial. These are not strategic choices about how best to *achieve* a client's objectives; they are choices about what the client's objectives in fact *are*.[62]

McCoy's attorney could have tried to persuade the jury that Appellant's mental state precluded a capital murder conviction, but he could not interfere with McCoy's protestations of innocence.[63]

Finally, the Supreme Court concluded that the error in *McCoy* was structural, requiring automatic reversal of the conviction.[64] The Court explained that its ineffective-assistance-of-counsel jurisprudence did not apply because what was at issue was "a client's autonomy, not counsel's competence."[65]

### 2. Similarities Between *McCoy* and Present Case

The factual similarities between Appellant's case and *McCoy* are striking. In both cases, the

---

[62] *Id*. at 1508 (citations and internal quotation marks omitted, emphasis in original). The Court in *McCoy* pointed out that a defendant "may hold life in prison not worth living and prefer to risk death for any hope, however small, of exoneration." *Id.* The Court also indicated that one possible "objective" of a defense would be for the defendant "to avoid, above all else, the opprobrium that comes with admitting he killed family members." *Id.*

[63] *Id.* at 1509 ("[Defense counsel] could not interfere with McCoy's telling the jury 'I was not the murderer,' although counsel could, if consistent with providing effective assistance, focus his own collaboration on urging that McCoy's mental state weighed against conviction.").

[64] *Id.* at 1511 ("Violation of a defendant's Sixth Amendment-secured autonomy ranks as error of the kind our decisions have called 'structural'; when present, such error is not subject to harmless-error review.") (citing *McCaskle v. Wiggins*, 465 U.S. 168, 177, n. 8 (1984)).

[65] *Id.* at 1510-11.

defense attorney's strategy was to concede that the defendant killed the victims but argue that the defendant was guilty of a lesser offense and that he should not get a death sentence. In both cases, the defendant disagreed with that strategy and testified contrary to it. And in both cases, the defendant maintained that he did not kill the victims and offered a "difficult to fathom" conspiracy theory as a defense.[66]

### 3. State's Arguments: Preservation of Error and Record Development

The State advances two arguments against reversing Appellant's conviction under *McCoy*. First, the State argues that Appellant forfeited any error by failing to timely object. The State contends that the trial court had no duty to address the issue until it was brought to its attention and that Appellant failed to object either before or during defense counsel's opening statement. The State's second argument is that the record is insufficient, as currently developed, to show a violation of *McCoy*. The State contends that Appellant did not say during his testimony that he objected to counsel's strategy when told about it. As we shall see, the preservation and record development claims in this case are interrelated.

---

[66] In a footnote, the Supreme Court stated that McCoy's attorney's lesser-included-offense strategy, being based on the defendant's alleged mental incapacity, "would have encountered a shoal, for Louisiana does not permit introduction of evidence of a defendant's diminished capacity absent the entry of a plea of not guilty by reason of insanity." *Id.* at 1506 n.1. The significance of this footnote is unclear, and the State does not contend that the footnote provides a basis for distinguishing this case from *McCoy*. We conclude that this footnote is not a basis for distinguishing Appellant's case from *McCoy* because Appellant maintained his innocence and did not ultimately receive a lesser-included-offense instruction. There is a substantial argument that Appellant's case would fall within the ambit of *McCoy* even if he had received a lesser-included-offense instruction, but we need not reach that question. *See supra* at n.62 and accompanying text (maintaining innocence and not admitting causing the death of a family member discussed as objectives of the representation under the defendant's control); *cf. State v. Wilson*, 324 S.W.3d 595, 598 (Tex. Crim. App. 2010) (in this Court's actual-innocence jurisprudence, "the term 'actual innocence' shall apply . . . only in circumstances in which an accused did not, in fact, commit the charged offense or *any of the lesser-included offenses*") (emphasis added).

We agree that a defendant cannot simply remain silent before and during trial and raise a *McCoy* complaint for the first time after trial.[67] But a defendant faced with a *McCoy* issue should not be expected to object with the precision of an attorney.[68] A defendant makes a *McCoy* complaint with sufficient clarity when he presents "express statements of [his] will to maintain innocence."[69]

The question we confront here, then, is: Does the record show that Appellant, in a timely fashion, made express statements of his will to maintain his innocence? We answer that question "yes."

There is no question that Appellant wanted to maintain his innocence. During his testimony, he did so explicitly, stating that he did not kill the victims and that they were killed as part of a conspiracy involving the mayor. When the prosecutor cross-examined Appellant about his attorney's opening statement, in which the attorney admitted that Appellant killed the victims, Appellant stated that he had wanted to object to it. And despite Appellant's explicit disagreement with his attorneys' strategy during his testimony, defense attorney McCann continued to follow that strategy in closing arguments, stating that Appellant had "snapped" and that he "still hasn't accepted what has happened."

Also, it is apparent from the defense's opening statement that his attorneys knew at the

---

[67] *McCoy*, 138 S. Ct. at 1509 (discussing *Florida v. Nixon*, 543 U.S. 175 (2004)).

[68] *See Gideon v. Wainwright*, 372 U.S. 335, 345 (1963) ("Even the intelligent and educated layman has small and sometimes no skill in the science of law. . . . He requires the guiding hand of counsel at every step in the proceedings against him."); *cf.* TEX. R. APP. P. 33.1 (an objection must normally "state[] the grounds for the ruling").

[69] *See McCoy*, 138 S. Ct. at 1509 ("If a client declines to participate in his defense, then an attorney may permissibly guide the defense pursuant to the strategy she believes to be in the defendant's best interest. Presented with express statements of the client's will to maintain innocence, however, counsel may not steer the ship the other way.").

beginning of trial that their strategy was contrary to Appellant's. McCann's statement that Appellant "can't admit what he did, to himself or anybody else" shows that he knew Appellant denied killing the victims. At that point, McCann clearly knew he and Appellant were still at odds on how to proceed, and that fact would have been apparent to the judge and jury as well. Further, Appellant's attorneys had revealed in pretrial hearings that they believed the only decisions Appellant was entitled to make were "whether to plea and to testify." This further reinforces the conclusion that the attorneys knew their concessions during opening statement were against Appellant's wishes, that they believed they were not required to follow his wishes, and that, in fact, they believed they were ethically obligated to act contrary to his wishes in order to best serve his interests.

### 4. Conclusion

In light of this discussion, we conclude that the record shows that Appellant adequately preserved his *McCoy* claim and that *McCoy* was violated by defense counsel at Appellant's trial. Because the error is structural, we conduct no harm analysis, and a reversal and remand for a new trial is required. Because Appellant's remaining points of error, even if meritorious, would not result in greater relief, we need not address them.

We reverse the judgment of the trial court and remand this case for a new trial.

Delivered: November 14, 2018

Publish