

# NUMBER 13-19-00017-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

JOHNNY MACK DURHAM JR.,                                           **Appellant,**

**v.**

THE STATE OF TEXAS,                                                 **Appellee.**

## On appeal from the 24th District Court
## of Victoria County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Longoria and Perkes
Memorandum Opinion by Justice Perkes**

Appellant Johnny Mack Durham Jr. appeals his conviction of felony murder, a first-degree felony. *See* TEX. PENAL CODE ANN. § 19.02(b)(3). Durham raises six issues on appeal, which we have reorganized and renumbered as follows: (1) the trial court was without jurisdiction to preside over his case; (2) the evidence was factually insufficient to

support a finding of competency; (3) the evidence was legally insufficient to convict Durham of felony murder; (4) in failing to allow evidence of Durham's drug test results, the trial court "deprived [him] of his constitutional right to have a jury instruction for intoxication manslaughter"; (5) "the jury charge was egregious"; and (6) the State failed to present "evidence legally or factually sufficient to support [a] prior conviction." We affirm.

## I.  BACKGROUND

On the morning of April 28, 2018, Lawrence Henry Christ Jr. was working at a car show in Victoria when he was struck by a vehicle driven by Durham in the car show parking lot. Christ succumbed to his injuries two hours later at the hospital.

Durham was indicted on July 26, 2018, and he was charged with murder with a habitual felony offender enhancement. *See id.* § 12.42(c)(1). Durham's attorney filed a motion for a competency examination on November 13, 2018, and following a psychiatrist's finding of competency, Durham filed an objection to the psychiatrist's report.

The trial court held a competency jury trial on December 3, 2018.

## A.  Competency Trial

### 1.  Defense's Witnesses

Concepcion Durham, Durham's wife, testified she has known Durham since middle school, and they have been married for two years. On the morning of his arrest, "[h]e seemed fine," said Conception. However, she noticed a change in Durham when she visited him at the jail a few days later. She said Durham had developed "a stuttering problem," and he experienced difficulty retaining or recalling information from prior recent conversations. Durham told her he saw "shadows and stuff coming in and out of his room,"

2

and he was convinced "they were trying to hurt him, the people would be mean to him, or he would think that they were trying to poison his food." Concepcion testified that Durham did not identify who "they" were.

On cross-examination, Concepcion stated she was unaware that Durham previously claimed loss of mental facilities and was found to be malingering when evaluated for competency for criminal court proceedings in 2010. Concepcion acknowledged Durham's speech and ability to converse fluctuated between phone calls, and he was still able to communicate effectively through coherently written letters.

Ezra Torres, Conception's eighteen-year-old daughter from a previous relationship, visited Durham "two or three weeks" after his arrest. Torres testified Durham claimed he did not recognize her and spoke "really slow" with a speech impediment. Torres stated it was a significant departure from his "really smart" and "really amazing" personality." Torres testified Durham also wrote her letters while he was in jail. In the most recent letter, Torres said Durham told her "how he's very proud of [her], that for [her] to take care of [her] mother, that he wants [her] to pursue [her] dream." Torres stated the letters were written legibly in cursive.

Durham's cousin, Mikayla Franklin, also testified she noticed a change in Durham's comprehension skills and ability to converse. Though Durham "had a drug addiction all [of] his life," Franklin maintained, "[H]e [was] just like me and you. His speech was clear. He was alert and oriented. He was normal." Franklin visited Durham several months after his arrest, and she said he could not remember who she was, "had some speech impairment," "kept stuttering," and "had a hard time perceiving what [she] was asking him."

3

## 2.      State's Witnesses

Lindsey Petru, Durham's parole officer, testified she went to visit him at the jail within a week of his arrest. Petru said Durham initially "claimed he didn't understand" and got "very upset and irate." Petru testified, "He also began to stutter, and then he wouldn't stutter, and then would, again." Petru maintained Durham "wanted to talk about his, his charges and why he was there" rather than discuss his imminent parole revocation hearing. Regardless, Petru opined Durham appeared to understand what she was communicating regarding his parole revocation rights.

During the preliminary parole hearing, Petru testified Durham continued to speak inconsistently; "he basically would speak normal and use larger words, and then in the next sentence, he would stutter a bunch and use smaller words." Petru surmised Durham was "faking" his mental incapacity.

Vicky Crumliss, a nurse at the jail, testified she believed Durham was competent. Crumliss said Durham asked "distinctive questions" on "sick calls," [1] and he "communicate[d] just fine." In one sick call, she stated he asked for "his money back for the meds," indicating he did not want his commissary account charged for prescription medications. In another call, she said "he asked for his diagnoses and his medications, what the names of them were." Crumliss said Durham never stuttered in front of her; "[he] only starts stuttering whenever he's in front of someone like the doctor." On cross-examination, Crumliss conceded her interactions with Durham had been limited to when she was dispensing medication or when he was in the infirmary.

---

[1] Crumliss explained that during "sick calls," she administered prescription medications to inmates.

4

Victoria County Sheriff's Deputy Jeff Green testified he was a courtroom bailiff during a child support matter in October, wherein Durham was present. Green witnessed Durham ask the judge if he could represent himself during proceedings. Green noted that Durham appropriately addressed the court and did not appear to have any visible handicaps.

On November 15, 2018, Joel Kutnick, M.D., a court-appointed psychiatrist, completed a competency evaluation of Durham. Dr. Kutnick testified that following the evaluation, he reviewed "multiple records," including jail phone calls made by Durham, and spoke with "individuals who had knowledge about the defendant." Dr. Kutnick concluded Durham was malingering:

> [I]n my interview, he says, "I don't know how old I am. I don't know my birth date. I don't know where I was born." . . . He talked about hallucinations, seeing things, that he had no memory, although he denied he had the drug abuse. He, he came across—as I was interviewing him, he came across as either in a [state of] severe dementia or retardation.

According to Dr. Kutnick, in addition to not knowing basic identifying information about himself, Durham was unable to do rudimentary math.[2] However, Dr. Kutnick noted

---

[2] Dr. Kutnick referenced his report at trial:

He was asked how old he was and what his birthdate was. He has been told his birthday is at the same time as his girlfriend's. The[n] he stated his girlfriend was actually his wife. I then asked him what the date was[,] and[,] he began thinking about it. Eventually, he answered, "1001, 1-90." He then stated these numbers were on his watch.

He is not certain where he was born. He doesn't remember how far he got in school. He claims he cannot read or write very well.
. . .

Since he came across as being [intellectually disabled], I wanted to see if he could count out money. He told me he does not know how to count out money when he goes to the store. I gave him an example. I asked him how much money he would get back if he had a dollar bill and spent 50 cents. He immediately stated, "I can't do that."

that Durham's presentation during the evaluation was clinically improbable and inconsistent with Durham's reported communications with others.

> [P]eople who have dementia, they first lose short-term memory first, and then as they get sicker and sicker[,] long-term memory. . . . but if you can't remember your—how old you are, your date of birth, but then you can remember about a document that you wanted from the parole officer, that just doesn't make clinical sense.

Dr. Kutnick opined that Durham's actions within days of his arrest demonstrated "[h]e has the cognitive capacity to understand the adversarial nature" of these proceedings. Durham invoked his Fifth Amendment rights and refused to speak to police. While in custody, he made requests for certain defense attorneys.[3] Medical records were also read into the record by Dr. Kutnick, which indicated that Durham "appears remorseful and wants to go to the man that was hurt." Dr. Kutnick added there was also no medical history present to signify "something happened to his brain" to make him as "cognitively impaired" as he presented himself during the evaluation.

Following the evaluation, Dr. Kutnick testified that he realized he had conducted a competency evaluation of Durham in 2010 and provided a diagnosis of malingering and antisocial personality disorder. Dr. Kutnick summarily testified, "[I]f I could wipe away all of the exaggeration, does [Durham] have some mental difficulties[?] [M]aybe, but not to the point that I felt like that would make him incompetent."

Dr. Kutnick further commented on Durham's present demeanor at trial, stating Durham has shown he is able to follow the judge's instructions, partake in the proceedings, and communicate with his attorney.

The jury returned a finding of competence, and the case proceeded to trial.

---

[3] In jail call recordings, Durham can be heard requesting defense attorneys by name.

6

**B.    Jury Trial**

Jon Szmagalski testified he was on the phone with a friend on the morning of April 28, 2018, when he witnessed a vehicle nearly cause multiple accidents. "He was coming the opposite direction from—it's a, it's a six-lane road with a median. . . . [F]rom his middle lane, he turned perpendicular to that turn lane and stopped. . . . The rear-end of his car was still in a traffic lane." Szmagalski said the driver subsequently pulled behind a semitruck, directly in front of Szmagalski's vehicle, before moving to the far-right lane. "As I was passing him, he just came back all the way over across three lanes and forced me to the median," testified Szmagalski, whose cell phone audio recording[4] was admitted at trial. Szmagalski said the driver was on his cell phone and appeared distracted.

According to Szmagalski, the driver weaved across several lanes "at least four or five times" and caused a semitruck to "lock up his brakes and somewhat jackknife in the road," before the vehicle turned off the road and pulled into the Citizens Medical Center (CMC) parking lot where a car show was being held.

Surveillance footage from CMC, as well as cell phone camera recordings taken by witnesses, were admitted into evidence. Several witnesses testified they saw a vehicle matching the description provided by Szmagalski drive recklessly in the CMC parking lot before running over Christ and striking multiple parked vehicles.

Juan Ramirez, the owner of a food truck operating at the car show, testified he heard an 18-wheeler blow its horn and then shortly after, he saw a car "coming up . . . kind of fast" inside the CMC parking lot. Ramirez testified he saw a man "hollering," trying to get the vehicle to stop. The vehicle finally stopped and the man "[s]lammed the hood [of

---

[4] Szmagalski testified he recorded all cell phone calls as part of his job.

the vehicle] once." Ramirez said he saw the vehicle "bump" the "man's knees twice." The man then moved over, "the car rev[ved] up," and Ramirez watched the man go "underneath the car."

Isaac Solis testified he was "just looking at the cars," when a vehicle drove by him "going too fast." Solis said he just felt "something [was] going to develop" so he took out his cell phone and started recording. He testified he saw a man running towards the vehicle, trying to get the driver's attention. Solis said the man said, "'Cut off your car. What's wrong with you?'" The car stopped, and Solis said he witnessed a man, later identified as Christ, position himself at the front of the vehicle and hit the hood. Solis then saw the vehicle run Christ over.

Linda Delgado-Cierra testified she also captured footage. Delgado-Cierra said the vehicle came to a complete stop and then drove into Christ after he had walked to the driver's side of the vehicle. She testified it appeared as if the driver meant to strike Christ.

Roy Gutierrez, the car show chairman, testified he was checking on vendors when a vehicle drove by him "at a high rate of speed" and "almost hit [him]." Gutierrez, accompanied by Douglas Jensen and Christ, rushed to flag down the driver. Gutierrez said Christ "was waving his hands, saying, 'Hey, stop,' trying to get [the driver's] attention." Gutierrez testified the car pulled over and stopped, and Gutierrez situated himself behind the vehicle to take a picture of the license plate.

Douglas testified that he, Christ, and Gutierrez had run up to Durham's vehicle, trying to get Durham "to put it in park and then to cooperate and get out." Douglas believed Durham "was being rational and obliging" up and until Durham turned his wheels in Christ's direction and ran him over. Douglas's wife, Dana, testified that throughout this

8

interaction, the driver never rolled down his windows; after he stopped his vehicle, he "s[at] with his hands clenched on the wheel and star[ed] straightforward," before he turned his steering wheel, struck Christ, and attempted to drive away.

Anica and Albert Aragon, owners of a food truck operating during the car show, testified they also witnessed the vehicle hit Christ. Anica testified Christ had done nothing threatening to warrant the driver's actions. Anica said the vehicle had come to a complete stop, then the driver "[h]it the gas and moved up towards him, and [Christ] tried to move out of the way, and the guy turned his wheels, and he literally ran over him." Anica testified, "[Christ's] legs got caught up by the driver's left wheel, and it pulled him under, and it rolled over him. . . . He didn't stop, try to stop." Albert described Christ as "[g]asping for air," and bleeding "[o]ut of his ears and mouth, nose" after he was struck.

Stephen Pierce, an off-duty state trooper, testified he "heard commotion" and then saw a "tan or gold colored passenger car driving away" from where a man, who had "obviously been run over," was lying on the ground. Pierce said the vehicle made "a U-turn towards the end of the pa[r]king lot. . . . struck a red Ford, a little T-bucket, . . . a black Camaro and came to rest under a blue canopy." Pierce said that he and Thomas Matusek then worked to pull a "noncompliant" Durham out of the vehicle. Matusek testified he put the vehicle in park and pulled out the keys while Pierce crawled into the back seat to get Durham, who was "backing up" and "kicking", out. Matusek described Durham as "combative and wanting to try to get away." Matusek said he tripped Durham to get him onto the ground, where Pierce used a belt to restrain him until law enforcement arrived.

Victoria Police Department (VPD) collision investigator Brian Knief testified the airbags in Durham's vehicle never deployed, and he opined it was likely due to the

9

vehicle's low rate of speed at impact. Knief said he also viewed the video recordings of the accident. Because the vehicle was stationary before Christ was struck; Christ, a 6'2" man wearing a neon t-shirt, was difficult to miss; and Christ was not located in front of the vehicle, Knief opined Durham's actions—turning the wheel to Christ's direction, moving at a "low speed," and running over Christ beginning with his feet and ending with his head—evidenced a "conscious objective moment."

VPD officer Christian Perez testified law enforcement believed Durham was under the influence, and Perez transported Durham to CMC to obtain a blood specimen. Perez testified that after he admonished Durham of his rights, Durham responded by calling him a "motherf*cker" and refused consent. Officers thereafter retrieved a blood warrant.

James Evans, a former forensic scientist at the Department of Public Safety, testified there was no alcohol detected, and the sample was released to a laboratory in Austin to test for other substances. No other results were admitted at trial.

Suzanna Dana, M.D., a forensic pathologist, performed Christ's autopsy. Dr. Dana noted that the "life threatening injuries to [Christ's] head and body" corresponded with being run over by a vehicle. Dr. Dana testified she watched the video where the vehicle can be seen running over Christ's feet, legs, pelvis, abdomen, and then head.

> [H]e died from multiple traumatic injuries due to blunt force. He had injuries to his head, mainly the head and skull and the brain, and then he had the injuries to the chest and the pelvic region due to that pressure coming across the right side of his body. He had the closed fracture of his right lower leg, and then he had all those scattered injuries external, the abrasions and bruises related to the blunt force injury.
>
> . . . .
>
> He had a lot of internal injuries in the chest and abdomen. One the most significant of which was his whole rib cage was just crushed, so he had multiple fractures on both the right and the left.

10

Dr. Dana opined that the manner of death was homicide.

Durham called one witness as part of his case-in-chief, Dustin Cabrera. Cabrera testified he was helping with his uncle's food truck on the day of the accident. "I knew they were saying to slow down. There were kids around the car show. . . . And just yelling," said Cabrera. According to Cabrera, "four or five" men surrounded Durham's car, "[Christ] hit the hood of the car, and then that's when it kind of all happened." Cabrera was shown a video on cross-examination, and he conceded that there only appeared to be two staff members close to the vehicle and three other watching persons nearby. Cabrera testified, "They were being forcefully—telling this gentleman to leave," but stopped short of calling Christ's actions threatening. "I don't know about threatening," said Cabrera.

The jury returned a guilty verdict and assessed punishment at forty years' confinement. This appeal followed.

## II. JURISDICTION

Durham raises several arguments regarding the trial court's lack of jurisdiction to preside over his case: (1) Judge Robert Bell was without authority to preside over the case because his "term had not begun as of date of trial to take the bench"; and (2) Judge Bell "did not hear the testimony of the witnesses for Appellant's competency hearing," and thus, his competency order is "void."[5] At the outset, we observe that a lack of jurisdiction is fundamental error and is appealable at any time, even if, as here, it is raised

---

[5] Durham also claims by a single sentence: "The unofficial removal of Judge Garza an[d] installing [of] a 'known racially bias [sic] judge' was an abuse of discretion by Judge Bell and deprived Appellant . . . a valuable constitutional safeguard." Durham, however, has not provided any legal analysis, authority, or argument in support of this assertion. Without a substantive analysis or supporting authorities, an issue cannot be adequately evaluated and will be overruled. *See* TEX. R. APP. P. 38.1(i); *Rocha v. State*, 16 S.W.3d 1, 20 (Tex. Crim. App. 2000) (explaining that arguments that fail to cite to authority in support of claim present nothing for review).

for the first time on appeal. *Stine v. State*, 908 S.W.2d 429, 431 (Tex. Crim. App. 1995).

Both parties agree that Durham's case was originally filed in Victoria County in the 24th/377th Judicial District, and Judge Bell is the presiding judge for the 267th Judicial District. Although Durham asserts that the 24th/377th Judicial District does not "hear" cases from Victoria County, he is incorrect. *See* TEX. GOV'T CODE ANN. § 24.125 ("The 24th Judicial District is composed of Calhoun, DeWitt, Goliad, Jackson, Refugio, and Victoria counties."); *id.* § 24.522(a) ("The 377th Judicial District is composed of Victoria County."). Moreover, Judge Bell, as the presiding judge of 267th Judicial District, also hears cases from Victoria County. *See id.* § 24.444 ("The 267th Judicial District is composed of Calhoun, DeWitt, Goliad, Jackson, Refugio, and Victoria counties."). Further, more than one judge may exercise authority over a single case, sit for another district court in the same county and hear and determine any case or proceeding pending in that court, and "exchange districts, or hold courts for each other when they may deem it expedient." TEX. CONST. art. V, § 11; *see* TEX. GOV'T CODE ANN. § 24.003; *see also Hull v. S. Coast Catamarans, L.P.*, 365 S.W.3d 35, 41 (Tex. App.—Houston [1st Dist.] 2011, pet. denied). The Texas Government Code provides, in applicable part, as follows:

(a) This section applies only to counties with two or more district courts.

(b) Unless provided otherwise by the local rules of administration, a district judge in the county may:

. . .

(2) hear and determine any case or proceeding pending in another district court in the county without having the case transferred;

(3) sit for another district court in the county and hear and determine any case or proceeding pending in that court;

12

(4) temporarily exchange benches with the judge of another district court in the county;

. . .

(6) occupy the judge's own courtroom or the courtroom of another district court in the county.

. . .

(d) A district judge in the county may hear and determine any part or question of any case or proceeding pending in any of the district courts, and any other district judge may complete the hearing and render judgment in the case or proceeding.

TEX. GOV'T CODE ANN. § 24.003; *see also Luna v. State*, No. 13-18-00152-CR, 2019 WL 3227261, at *1–2 (Tex. App.—Corpus Christi–Edinburg July 18, 2019, pet. ref'd) (mem. op., not designated for publication) ("Pursuant to the exchange of benches section in the government code, district judges have wide discretion to temporarily exchange benches with the judge of another district court in the county, hear and determine matters pending in other district courts within the county . . .."). Nothing in § 24.003 of the Texas Government Code or article V, § 11 of the Texas Constitution requires a written order or explanation for an exchange of benches by district judges. *See Mata v. State*, 669 S.W.2d 119, 121 (Tex. Crim. App. 1984); *In re Rio Grande Valley Gas Co.*, 987 S.W.2d 167, 175 (Tex. App.—Corpus Christi–Edinburg 1999, orig. proceeding) (en banc); *see also Luna*, 2019 WL 3227261, at *1–2.

We take judicial notice that Judge Bell was appointed into office on August 5, 2016, and he has since remained on the bench as the presiding judge for the 267th Judicial District. *See* TEX. R. EVID. 201(b); *Sharpe v. State*, 490 S.W.2d 834, 836 (Tex. Crim. App. 1973) ("Judicial notice is taken of the system of courts of this state, their jurisdiction, terms and operation, and the judges and other officers thereof.") (citations omitted); *see also*

*Herrod v. State*, 650 S.W.2d 814, 817 (Tex. Crim. App. 1983) ("While this record does not so reflect, we can take judicial notice that Judge Ed Gossett retired as a district judge on December 31, 1976, and timely filed his election to continue in a judicial capacity as shown by the records of the Chief Justice of the Supreme Court of Texas."); *Gannaway ex rel. Estate of Gannaway v. Pena*, No. 13-99-00426-CV, 2002 WL 441993, at *3 (Tex. App.—Corpus Christi–Edinburg Mar. 21, 2002, no pet.) (mem. op., not designated for publication) (taking judicial notice of a judge's authority to preside over a case).

Accordingly, under § 24.003 of the government code and article V, § 11 of the Texas Constitution, Judge Bell had jurisdiction to preside over Durham's case. *See* TEX. CONST. art. V, § 11; TEX. GOV'T CODE ANN. § 24.003; *Mata*, 669 S.W.2d at 121; *see also In re McGuire*, 134 S.W.3d 406, 409–10 (Tex. App.—Waco 2004, orig. proceeding).

Durham's subsidiary claim that Judge Bell was without authority to sign the competency order because he was not present for the competency trial is similarly settled. The reporter's record—and paradoxically, Durham's brief—indicates Judge Bell was presiding over the case throughout the entire duration of the competency trial. We therefore decline to engage in an analysis of the limitations of the "free exchange of benches." *See Hull*, 365 S.W.3d at 41. We overrule Durham's first issue.

### III.   COMPETENCY

By his second issue, Durham argues the evidence was insufficient to support a finding of competency.

A criminal defendant who is incompetent may not be put to trial without violating due process. *Turner v. State*, 422 S.W.3d 676, 688–89 (Tex. Crim. App. 2013) (*Turner I*). Under our statutory scheme, "a defendant is presumed competent to stand trial and shall

14

be found competent to stand trial unless proved incompetent by a preponderance of the evidence." TEX. CODE CRIM. PROC. ANN. art. 46B.003(a). A person is incompetent to stand trial if the person does not have: "(1) sufficient present ability to consult with the person's lawyer with a reasonable degree of rational understanding; or (2) a rational as well as factual understanding of the proceedings against the person." *Id.* art. 46B.003(a)(1)–(2). In *Morris v. State*, the Court of Criminal Appeals elaborated on the evidence considered in a competency hearing:

> Evidence related to [article 46B.003] issues includes whether a defendant can (1) understand the charges against him and the potential consequences of the pending criminal proceedings; (2) disclose to counsel pertinent facts, events, and states of mind; (3) engage in a reasoned choice of legal strategies and options; (4) understand the adversarial nature of the criminal proceedings; (5) exhibit appropriate courtroom behavior; and (6) testify.

301 S.W.3d 281, 285–87 (Tex. Crim. App. 2009); *see Turner v. State*, 570 S.W.3d 250, 262 (Tex. Crim. App. 2018) (*Turner II*). A defendant's competency to stand trial is a question of fact to be determined by the appropriate factfinder, which, in this case, was a competency jury. *Turner II*, 570 S.W.3d at 262.

On appeal, the correct standard of review is whether after considering all the evidence relevant to the issue at hand, the finding of competency is so against the great weight and preponderance of the evidence so as to be manifestly unjust. *Meraz v. State*, 785 S.W.2d 146, 155 (Tex. Crim. App. 1990); *Perez v. State*, 583 S.W.3d 762, 764–65 (Tex. App.—El Paso 2019, no pet.); *Galvan v. State*, 324 S.W.3d 233, 235 (Tex. App.—Eastland 2010, pet. ref'd); *Williams v. State*, 191 S.W.3d 242, 248–51 (Tex. App.—Austin 2006, no pet.). We view the entirety of the evidence in a neutral light and defer to the jury's credibility determinations. *Perez*, 583 S.W.3d at 764–65; *Lasiter v. State*, 283 S.W.3d 909, 916–17 (Tex. App.—Beaumont 2009, pet. ref'd) ("[T]he jury is the judge of

15

the credibility of the witnesses at the competency hearing and the weight to give to the testimony."). We may sustain an appellant's factual sufficiency claim only if, after setting out all the relevant evidence and explaining precisely how the contrary evidence greatly outweighs the evidence supporting the verdict, we clearly state why the verdict is so much against the great weight of the evidence so as to be manifestly unjust, conscience-shocking, or clearly biased. *Matlock v. State*, 392 S.W.3d 662, 671 (Tex. Crim. App. 2013).

Durham's relatives each uniformly testified that Durham spoke "slowly" and with a "stutter," in contrast to his known speech pattern prior to his arrest. They also opined that he appeared to have difficulty understanding questions or recalling basic information. Yet, his wife conceded that Durham's ability to converse fluctuated between phone calls, and both she and Torres testified Durham was still able to communicate effectively through legibly written, coherent letters.

The jury was free to reject the conflicting opinions of Durham's relatives if, for example, they believed the opinions were prejudiced by their associations or that Durham had intentionally exaggerated the degree of his impairment in light of the contravening evidence. *See Perez*, 583 S.W.3d at 764–65; *Lasiter*, 283 S.W.3d at 916–17*.* For example, Dr. Kutnick testified that though Durham initially "came across as either in a [state of] severe dementia or retardation," Durham's presentation during the evaluation was in contrast to his medical records, jail phone call recordings, and information provided by his parole officer and nurse. Petru and Crumliss indicated that Durham was able to communicate without issue regarding parole and medical issues, respectively, and both believed Durham to be "faking" his incompetency. Dr. Kutnick noted that Durham's

speech and communication abilities varied inconsistently in jail phone call recordings, and Durham was able to relay information clearly in written format—despite claiming during the evaluation that he could not read or write.

Moreover, Dr. Kutnick testified Durham appeared to understand the adversarial nature of criminal proceedings. *See Morris*, 301 S.W.3d at 285–87. There was evidence via his medical records and his purported interactions with law enforcement that Durham had no difficulty communicating or expressing comprehension of the situation immediately following his arrest. Dr. Kutnick further opined that he observed Durham throughout the competency trial and noted Durham's perceived ability to listen to the trial court, retain information provided by the court, appropriately address the trial court when needed, and follow the trial court's orders in the interim. Dr. Kutnick expressed his opinion that Durham was malingering, Durham had a rational as well as a factual understanding of the proceedings against him, and Durham had a sufficient present ability to consult with his attorney. *See* TEX. CODE CRIM. PROC. ANN. art. 46B.003. The jury here could have reasonably concluded, as the State asserted, that Durham modified his behavior and appearance for his competency examination and periodically while speaking with relatives, and thus, Durham was competent to stand trial. *See Turner II*, 570 S.W.3d at 262; *Perez*, 583 S.W.3d at 764–65.

After considering the evidence presented during the competency hearing, we conclude that the jury's finding is not so against the great weight and preponderance of the evidence as to be manifestly unjust. *See Turner II*, 570 S.W.3d at 262; *Meraz*, 785 S.W.2d at 155. Durham's second issue is overruled.

17

## IV. CONVICTION

Durham next argues the evidence was legally insufficient to convict him of the offense of felony murder because the state failed to prove he committed an act clearly dangerous to human life or that he "did any act intentionally and knowingly to cause the death of [Christ]."

In reviewing the sufficiency of the evidence to support a conviction, we consider the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Stahmann v. State*, 602 S.W.3d 573, 577 (Tex. Crim. App. 2020) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We resolve any evidentiary inconsistencies in favor of the verdict, keeping in mind that the jury is the exclusive judge of the facts, the credibility of the witnesses, and the weight to give their testimony. *Id.*; *see* TEX. CODE CRIM. PROC. ANN. art. 38.04.

Sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Metcalf v. State*, 597 S.W.3d 847, 856 (Tex. Crim. App. 2020) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). When the jury charge authorizes conviction on multiple theories of liability, we will sustain the conviction if the evidence is sufficient to prove any of the theories submitted in the jury charge. *Stahmann*, 602 S.W.3d at 577 (citing *Campbell v. State*, 426 S.W.3d 780, 786 (Tex. Crim. App. 2014)).

Here, a hypothetically correct charge would instruct the jury to find Durham guilty of felony murder as alleged if: (1) he committed or attempted to commit aggravated assault by threat or injury, and (2) in the course of and in furtherance of the commission

18

or attempt, he committed or attempted to commit an act clearly dangerous to human life that caused Christ's death. *See* TEX. PENAL CODE ANN. § 19.02(b)(3). The charge would further state that: a person commits aggravated assault *by injury* if he intentionally, knowingly, or recklessly causes serious bodily injury to another, *id.* §§ 22.01(a), 22.02(a)(1); and a person commits the offense of aggravated assault *by threat* if he intentionally or knowingly "uses or exhibits a deadly weapon during the commission of the assault" as defined in § 22.01. *Id.* §§ 22.01(a) (providing a person commits assault if the person "intentionally, knowingly, or recklessly causes bodily injury to another" or "intentionally or knowingly threatens another with imminent bodily injury"), 22.02(a)(2). "Bodily injury" means physical pain, illness, or any impairment of physical condition. *Id.* § 1.07(a)(8). "Serious bodily injury" means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ. *Id.* § 1.07(a)(46). The "act clearly dangerous to human life" must be the cause of the victim's death. *Rodriguez v. State*, 454 S.W.3d 503, 507 (Tex. Crim. App. 2014). Whether the act is clearly dangerous to human life is measured under an objective standard, not the subjective belief of the actor. *Lugo–Lugo v. State*, 650 S.W.2d 72, 81 (Tex. Crim. App. 1983); *see also Boudreaux v. State*, No. 14-18-00891-CR, 2020 WL 2214447, at *4 (Tex. App.—Houston [14th Dist.] May 7, 2020, pet. ref'd) (mem. op., not designated for publication). To be clearly dangerous to human life, the act need only threaten or risk a resulting death. *See Lugo–Lugo*, 650 S.W.2d at 88.

Felony murder essentially is "unintentional" murder committed in the course of a felony. *Rodriguez*, 454 S.W.3d at 507; *see O'Brien v. State*, 544 S.W.3d 376, 388 n.45

19

(Tex. Crim. App. 2018) (observing that intentional and knowing aggravated assault can serve as the predicate felony for felony murder). In *Lomax v. State*, the court of criminal appeals pointedly observed it was "significant and largely dispositive that Section 19.02(b)(3) omits a culpable mental state while the other two subsections in Section 19.02(b) expressly require a culpable mental state." 233 S.W.3d 302, 304 (Tex. Crim. App. 2007).

Durham does not dispute that he struck Christ or ran Christ over with his vehicle, but rather, he argues he lacked the requisite intent to "kill" because "one can reasonably assume" that he, "a black male, felt threaten[ed] being surrounded by at least three angry [sic] which two were white." Durham, however, misstates the State's burden. In charging Durham with felony murder, the State need only prove that Durham intentionally or knowingly committed or attempted to commit aggravated assault by threat or injury and in the course of and in furtherance of the commission or attempt, he committed an act "clearly dangerous to human life." *Compare* TEX. PENAL CODE ANN. § 19.02(b)(1) *with id.* §§ 19.02(b)(3) & 6.03(a)–(c); *see Driver v. State*, 358 S.W.3d 270, 279 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) ("Under *Lomax,* felony murder requires no culpable mental state in causing the death of an individual").

Intent is a question of fact and therefore within the sole purview of the jury, and the jury may rely on its collective common sense and apply common knowledge and experience. *Acosta v. State*, 429 S.W.3d 621, 625 (Tex. Crim. App. 2014). The evidence showed: (1) after nearly causing multiple vehicle collisions, Durham turned into the CMC parking lot where a car show was being held; (2) Durham continued to drive recklessly fast through a parking lot filled with families and children and almost struck an individual

20

in attendance; (3) Durham stopped his vehicle only after he was flagged down by three men, two of which were wearing green neon shirts with the words "Staff" imprinted; (4) Durham then, as Ramirez claimed, "bump[ed]" Christ's "knees twice" with his vehicle, prompting Christ to move from the front of the vehicle to near the front left tire; (5) Durham "rev[ved] up," turned his wheels in Christ's direction, and hit Christ; (6) once Christ was down and the vehicle was over his lower half of his body, rather than stop his vehicle or maintain a straight path, Durham continued to turn his wheel in Christ's direction, running over Christ's abdomen, chest, and head; and (7) Durham then quickly accelerated and attempted to flee before crashing into several parked vehicles and coming to rest under an awning. Dr. Dana unequivocally testified that the injuries Christ sustained caused his death. A rational jury here could conclude, relying on its collective common sense and applying its collective common knowledge, Durham intentionally or knowingly committed or attempted to commit aggravated assault by threat or injury and in the course of and in furtherance of the commission or attempt, he committed an act "clearly dangerous to human life."

A rational jury could further conclude that Durham was aware that his actions—i.e., driving at fast speeds in a parking lot, striking an individual with a vehicle, and slowly driving over an individual with an impact great enough to cause multiple blunt force injuries including multiple fractures all over the victim's body—were reasonably likely to result in injury or death of a person. *See, e.g.*, *Stanley v. State*, 470 S.W.3d 664, 672 (Tex. App.—Dallas 2015, no pet.) (holding that a reasonable jury could have determined that traveling at 38 to 40 miles per hour after dark through the scene of an accident where emergency personnel were present, police lights were flashing, and traffic was being

diverted was an act clearly dangerous to human life); *see also Boudreaux*, 2020 WL 2214447, at *5 (affirming a felony murder conviction where evidence was sufficient to establish that appellant was the operator of the truck when it hit and killed a man, was aware that an accident had occurred, and was aware of the reasonable likelihood that someone may have been injured or killed in the accident); *Sanders v. State*, No. 06-14-00079-CR, 2015 WL 4744406, at *1 (Tex. App.—Texarkana Aug. 12, 2015, pet. ref'd) (mem. op., not designated for publication) (upholding a felony murder conviction where defendant struck police officer while attempting to exit a parking lot).

Considering all the evidence presented to the jury, we conclude there is more than sufficient evidence to show Durham intentionally or knowingly committed or attempted to commit aggravated assault by threat or injury and in the course of and in furtherance of the commission or attempt, he committed an act "clearly dangerous to human life." *See* TEX. PENAL CODE ANN. §§ 19.02(b)(3), 22.01(a), 22.02(a)(2); *Rodriguez*, 454 S.W.3d at 507; *see also Boudreaux*, 2020 WL 2214447, at *5. Thus, we conclude the evidence is legally sufficient to support Durham's conviction for felony murder. We overrule issue three.

## V.    JURY CHARGE

By his fourth issue, Durham broadly argues that the jury charge contained error and caused him egregious harm. Durham takes issue with the "eleven different revisions changing the definition of intentionally and knowing, which goes to mens rea or the culpable mental state associated with the result of the defendant's conduct" and the "general abstract provisions of the Charge of the Court given at the guilt/innocence phase of the trial," which he quotes in his brief:

22

> A person commits the offense of "FELONY MURDER" if he commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.

The language, however, for both the "intentionally" and "knowingly" definitions, as well as the definition for felony murder follow the statute verbatim. *See* TEX. PENAL CODE ANN. § 6.03(a) (providing the definition for intentionally), § 6.03(b) (providing the definition for knowingly); § 19.02(b)(3) (providing the definition for felony murder).

In any event, Durham provides no additional discussion beyond the aforementioned quoted statements or application of authority with respect to this issue. *See* TEX. R. APP. P. 38.1(i) ("The brief must contain a clear and concise argument for the contention made, with appropriate citations to authorities and to the record."). Thus, we conclude this issue has been inadequately briefed, and we overrule Durham's fourth issue.

## VI.    INTOXICATION MANSLAUGHTER

In a multifaceted fifth issue, Durham argues (1) the trial court erred in disallowing evidence of "the results of his blood analysis . . . to establish intoxication manslaughter," thereby "depriv[ing] [him] of his constitutional right to have a jury instruction for intoxication manslaughter"; and (2) his conviction violates the Double Jeopardy Clause.

### A.    Evidence Exclusion

Durham states in his brief that he "was not allowed to have on the record the results of his blood analysis admitted as evidence to establish intoxication manslaughter." However, the State admitted the laboratory results of Durham's blood draw at trial. To the extent Durham is referring to his medical records, which indicated he was positive for

23

PCP and THC with no quantities specified, Durham's trial counsel requested that the records be excluded from evidence. Thus, Durham's evidentiary exclusion issue is without merit. *See* TEX. R. APP. P. 33.1(a) (regarding preservation of error).

**B.     Lesser-Included Offense**

We construe Durham's subsidiary claim as a request for the lesser-included offense of intoxication manslaughter.

A trial judge has a duty to prepare a jury charge that accurately sets out the law applicable to the specific offense charged. *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007); *see* TEX. CODE CRIM. PROC. ANN. art. 36.14. A jury instruction on a lesser-included offense, however, is not required absent a request by the defense for its inclusion in the jury charge. *See Mendez v. State*, 545 S.W.3d 548, 552 (Tex. Crim. App. 2018); *Tolbert v. State*, 306 S.W.3d 776, 781 (Tex. Crim. App. 2010). In other words, a trial judge does not have a duty to sua sponte instruct the jury on lesser-included offenses. *Mendez*, 545 S.W.3d at 552. Accordingly, a defendant cannot complain on appeal about the trial judge's failure to include a lesser-included-offense instruction "that he did not preserve by request or objection: he has procedurally defaulted any such complaint." *Vega v. State*, 394 S.W.3d 514, 519 (Tex. Crim. App. 2013); *see also* TEX. CODE CRIM. PROC. art. 36.14 ("Before said charge is read to the jury, the defendant or his counsel shall have a reasonable time to examine the same and he shall present his objections thereto in writing, distinctly specifying each ground of objection.").

Durham made no request for a lesser-included-offense instruction at trial. [6] Therefore, there is no error. *See Mendez*, 545 S.W.3d at 552 ("[A] trial court does not err

---

[6] Durham's charge objections were as follows:

by failing to instruct the jury on an issue that was, by virtue of the defendant's silence, simply inapplicable to the case."); *see also* TEX. R. APP. P. 33.1(a). As such, we reject this argument.

## C.  Double Jeopardy

Durham additionally argues he "falls into the third category prohibited by *Bigon*: he has been punished twice for the same offense," in violation of the Double Jeopardy Clause.[7] *See* U.S. CONST. amend. V.; *Bigon v. State,* 252 S.W.3d 360, 369–70 (Tex. Crim. App. 2008). However, Durham's argument is limited to this single assertion and lacks appropriate citations to authorities and to the record. *See* TEX. R. APP. P. 38.1(i) ("The brief must contain a clear and concise argument for the contention made, with appropriate citations to authorities and to the record."). We conclude this issue has been inadequately briefed.[8] Accordingly, we overrule Durham's fifth issue in each of its parts.

## VII.  ENHANCEMENT

By his last issue, Durham challenges the sufficiency of the evidence supporting one of the State's enhancement paragraphs.

Generally, if it is shown on the trial of a felony of the first degree that the defendant has previously been finally convicted of a felony other than a state jail felony, on conviction

---

Judge, we would object to the phrase "or in immediate flight from the commission or attempt," under the felony murder application paragraph. And we would object to the order of the verdict forms. We would ask that "not guilty" be first, in keeping with the presumption of innocence. Other than that, we have no addition or requested instructions.

[7] The Double Jeopardy Clause of the Fifth Amendment prohibits the punishment of an accused in a second trial when the accused has already been convicted or acquitted of that crime, and it forbids punishing an accused more than once for the same offense in a single prosecution. *See* U.S. CONST. amend. V; *Loving v. State*, 401 S.W.3d 642, 646 (Tex. Crim. App. 2013).

[8] We additionally note that Durham does not cite to and we have not found evidence in the record that Durham was tried or punished more than once for the death of Christ. *See Loving*, 401 S.W.3d at 646.

the defendant shall be punished by imprisonment in the Texas Department of Criminal Justice for life, or for any term of not more than 99 years or less than 15 years. TEX. PENAL CODE ANN. § 12.42(c).

In reviewing the sufficiency of the evidence to support a finding that an enhancement allegation is true, we consider all the evidence in the light most favorable to the State and determine whether a rational trier of fact could have found the elements of the enhancement beyond a reasonable doubt. *Lopez v. State*, 600 S.W.3d 43, 45 (Tex. Crim. App. 2020); *Wood v. State*, 486 S.W.3d 583, 589 (Tex. Crim. App. 2016). To prove a prior conviction for enhancement, the State must prove beyond a reasonable doubt that (1) a prior conviction exists, and (2) the defendant is linked to that conviction. *Flowers v. State*, 220 S.W.3d 919, 921 (Tex. Crim. App. 2007); *see also Medrano v. State*, No. 13-17-00150-CR, 2018 WL 2252888, at *2 (Tex. App.—Corpus Christi–Edinburg May 17, 2018, no pet.) (mem. op., not designated for publication).

Here, the State presented three enhancement paragraphs in the indictment:

And it is further presented in and to said Court that, prior to the commission of the aforesaid offense the Defendant was finally convicted of the following felonies pursuant to Section 12.42 & 12.425 Texas Penal Code and article 42.12 Sec 4 (d)&(e) Texas Code of Criminal Procedure in that:

1. On the 15th day of December, A.D., 1999, in cause number 99-4-17,693-D in the 377th Judicial District Court of Victoria County Texas, JOHNNY MACK DURHAM, JR., was finally convicted of UNLAWFUL DELIVERY OF A CONTROLLED SUBSTANCE in Penalty Group 1 in violation of HSC §481.112(c), a Second Degree Felony offense committed or arrested on 25th day of May, A.D., 1999;

2. On the 16th day of November, A.D., 2007, in cause number 32068CR in the 40th Judicial District Court of Ellis County Texas, the defendant, JOHNNY MACK DURHAM, JR., *A/K/A* ROBERT ALLEN SUTTON, was finally convicted of INJURY TO AN ELDERLY PERSON in violation of PC §22.04, a Second Degree Felony offense committed or arrested on 7th day of May, A.D., 2007;

3. On the 18th day of January, A.D., 2011, in cause number 10-9-25409-D in the 377th Judicial District Court of Victoria County Texas, the defendant, JOHNNY MACK DURHAM, JR., was finally convicted of UNLAWFUL DELIVERY OF A CONTROLLED SUBSTANCE in Penalty Group 1 in violation of HSC §481.112(c), a Second Degree Felony offense committed or arrested on 26th day of May, A.D., 2010.

At trial, however, the State proceeded only on the two controlled substance enhancement paragraphs. The injury to an elderly person enhancement paragraph did not appear in the jury charge; thus, the jury did not enter an affirmative finding that Durham had been convicted of injury to an elderly person.

On appeal, Durham does not challenge the sufficiency of the evidence to support either of the submitted enhancement paragraphs, both of which the jury found to be true. Instead, Durham argues that he was not convicted of the offense of injury to an elderly person and the State did not offer sufficient evidence to prove he committed the offense. Therefore, Durham's complaint is of no consequence. We overrule Durham's sixth issue.

## VIII. CONCLUSION

We affirm the trial court's judgment.

GREGORY T. PERKES
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
29th day of October, 2020.