# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-19-00573-CR

**Charles Reedy, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE 450TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-DC-17-300977, THE HONORABLE BRAD URRUTIA, JUDGE PRESIDING

### M E M O R A N D U M   O P I N I O N

A jury convicted Charles Reedy of murder. *See* Tex. Penal Code § 19.02. The trial court entered judgment on the verdict and assessed punishment at 25 years' imprisonment. In two appellate issues, Reedy contends that the trial court abused its discretion by (1) overruling his objection and admitting a detective's opinion testimony that Reedy was guilty and (2) refusing to grant a mistrial after a prosecutor's remark during guilt–innocence rebuttal argument. We affirm.

### BACKGROUND

Glen Burford was found lying face down at a bus stop in central east Austin, bleeding to death. Paramedics responded to the scene, assessed his breathing, and immediately attempted to revive him. There was blood under his chest on the sidewalk, smeared on his left arm, and on his t-shirt. He had a puncture wound near the bottom of his heart, which killed him.

Police officers responded to the scene shortly after the paramedics arrived. While waiting for homicide detectives, one of the first-responding officers saw Reedy sitting at the bus

stop, a few feet away from Burford's body. Reedy was wearing an unstained, white t-shirt. The two talked, and the officer noted Reedy's slurred speech, bloodshot eyes, and odor of alcohol. Reedy grew frustrated and wanted to leave, but the officer detained him. While the officer waited for detectives, Reedy volunteered that he knew and lived with the victim and talked with him earlier inside their house when Burford left to meet someone at the bus stop. Reedy later told police that he had been in Burford's room with him, although he claimed that they separated about 10 minutes before Burford was killed. Reedy said he "heard a disturbance out at the bus stop, he went to go check on what had happened, and that's where we found the victim at the bus stop" and saw paramedics working on the body.

Once a detective arrived, the officer handcuffed Reedy and put him in a patrol car. The car's audio- and video-recording equipment recorded Reedy, who was alone, saying, "Fuck, Glen. I'm sorry." Shortly after, Reedy, still alone, said, "My knife? I don't think so."

An apparent trail of bloodstains led from the bus stop to the house where Reedy and Burford lived together. Police found the house dark, dirty, and "unkept" and saw blood on the front doorframe. They found another housemate, Michael McGinnis, in his room and led McGinnis outside and handcuffed him. Reedy and McGinnis were not friends—the police had once been called out when McGinnis held a knife to Reedy's neck. McGinnis testified at trial that about 30 minutes before police led him outside, he heard heavy footsteps from someone "bound[ing]" upstairs, toward Reedy's second-floor bedroom.

Another roommate, David De La Rosa, testified that Reedy and Burford were friends and would drink alcohol and "fellowship together." Even so, leading up to the day in question, De La Rosa felt that Reedy and Burford "were having some kind of friction." Burford owed Reedy money. In fact, Reedy told De La Rosa that he "was ready to hurt" Burford, which

2

De La Rosa considered a threat.  Over the same period, McGinnis heard Reedy one day "beating on the walls and the door for a while, telling [Burford] he has an ass whooping coming and screaming 'faggot' at him."

Officers got a warrant to search the home.  Inside, Sgt. Daryl Tynes, who was a detective at the scene, and a crime-scene specialist saw blood-like stains on the interior front door jamb on its left-hand side from the point of view of someone leaving the house to go outside.  These stains suggested to Sgt. Tynes that a bleeding event happened inside the house with the screen door closed.  When Sgt. Angie Jones, the lead detective on this case, later looked at these stains, she thought they resembled a "hand swipe."

Sgt. Tynes, other detectives, and the crime-scene specialist continued searching the house and saw more apparent blood stains, on the room side of the door jamb of Burford's room on the first floor.  When Sgt. Jones reviewed these later, they also looked to her like a "hand swipe," and their appearance and location on the room side of the door jamb suggested to her that "a bloodletting event" happened in Burford's room.  They were on the left-hand side of the door jamb from the point of view of someone leaving the room to enter the hallway.  Inside Burford's room was a sleeping bag with an apparent blood stain.  The investigators did not notice any similar stains in any of the other rooms downstairs, save for the possible presence of blood on the bathroom sink.  The only other blood-like stains were the trail of drops from Burford's room to the front door.

The investigators searched McGinnis's room and seized a stained pair of jeans and his hunting knife—a large, single-edged Bowie knife that was in its sheath.  The stain on the jeans looked like blood, and McGinnis later explained that it was from when he was cut while on the bus and that he takes a blood thinner, which made the wound bleed a lot.

After going upstairs, the investigators seized from Reedy's bedroom a wallet with his ID in it, a cell phone, a steak knife, and a lock-blade knife "in the open position." The crime-scene specialist took photos of the lock-blade knife in part because of "unknown," "reddish/brown, rust colored" stains on it. But the investigators did not collect as evidence "any other T-shirts or clothing that was in [Reedy's] room." Nor did they find any other clothing on the property showing blood. Officers also gathered statements from a witness saying that someone had rattled the chain-link fence in the house's backyard and another saying that a person in a red hat ran through the alley behind the house when officers were first entering it.

The day of the murder, Reedy took the bus to borrow DVDs from the library and buy alcohol. A library employee saw him have an extended, "angry exchange" with another man—Burford—after the man asked Reedy for a nickel. The employee had never seen Reedy violent before, but Reedy's behavior this time made him concerned for library patrons and staff's safety.

That night at police headquarters, Sgts. Jones and Tynes interviewed Reedy the first of what would be three times. He was wearing a white t-shirt and white socks and shoes, all matching what he had worn earlier to the library, and there was no blood on any of his clothing. An officer took photos of him, including of his hands, which showed no sign of a struggle. Reedy, though heavily drunk, answered questions and both in this interview and in another repeatedly suggested that Burford had been shot. He said that an officer told him so, but the detectives knew, and did not divulge, that Burford was instead stabbed.

Recounting the evening's events, Reedy said that when he got home he went to Burford's room and that only they two were in the room. He said that while they talked, Burford suddenly told him to wait because Burford needed to meet someone outside, so he waited in Burford's room when Burford left. Just a few minutes later, Reedy said, he heard a noise outside.

4

He said that he went out and saw the body on the ground but did not know that it was Burford. In his telling, Reedy was the last person to see Burford alive in the house before Burford fell outside about five to ten minutes later. He added: "It looks bad for me since I'm in his apartment when—right around the—whatever happened—he got shot, ya know?" At other times in the interview, although he said that he did not know how Burford had been hurt, he encouraged the detectives to focus on McGinnis. After the interview, Reedy signed a statement about the evening's events and left, and Sgt. Jones went to the house.

About two and half weeks later, Sgts. Jones and Tynes went to Reedy's house to interview him there. They still did not arrest him, but he asked them, "Did you all take my steak knife too?" and explained, "I was gonna cook something and didn't have my steak knife."

Over a month later, after Reedy's murder arrest, Sgts. Jones and Tynes interviewed him again. He changed his story and claimed that he went to his own room before going to Burford's that night, explaining that he had wanted to go to the grocery store but forgot his wallet. But, in his own telling, he again forgot his wallet when he left his room and went to Burford's.

The State indicted Reedy for murder, and the case proceeded to a jury trial. The State called as witnesses Sgts. Jones and Tynes, McGinnis, De La Rosa, a paramedic, a responding police officer, the crime-scene specialist, and others. Among the others was the medical examiner who performed the autopsy. She explained that Burford died of a stab wound to his chest and had other, non-fatal wounds. The stab wound was from "a sharp instrument"—potentially but not necessarily a knife—with a "single sharp edge and a blunt edge." The other wounds included six "sharp force injury wounds" on his left hand and its fingers, which she considered either "defensive wounds" from a "close-encounter assault or an attack" or wounds resulting from Burford's himself

5

being the aggressor. The injuries to Burford's left hand, according to Sgt. Tynes, matched the apparent blood stains on the left-hand side of Burford's bedroom's door jamb.

Based on Burford's wounds, the medical examiner would have expected to see blood transferred from Burford to whoever fought him. And the fatal stab wound would not have kept Burford from leaving the house and only then collapsing in a neighboring lot. He could have wandered a few minutes before dying. The medical examiner also took samples from Burford's hands and fingers, and samples like those, if tested, can contain an assailant's DNA.

The State also called as a witness a DNA analyst who was involved with testing evidence, including known samples of DNA from Reedy and Burford. The analyst and her colleagues DNA-tested five samples taken from spots on the lock-blade knife seized from Reedy's room. The analyst "believe[d]" that there was "blood found on the evidence" tested by her lab. Tests of samples from the knife's blade revealed Burford to be the "major male contributor" of the DNA recovered and that it was likely that this was indeed Burford's DNA on the knife. Tests of the other samples left the analyst unable to exclude either Burford or Reedy as contributors to the DNA found. And a test from a sample from the knife's handle showed the likely presence of Reedy's DNA. The analyst's lab also tested samples taken from the stain on the jeans seized from McGinnis's room, but neither Reedy's nor Burford's DNA was detected.

On cross-examination, the analyst admitted that her lab used an expired reagent at one step of its work here and that this mistake could have changed certain results. But she later clarified that the reagent issue would not change her conclusions here. She also acknowledged that the serologist whose work on the case came before her own had once failed a proficiency test and no longer worked for the lab because he took a job with the Colorado Bureau of Investigation.

6

Reedy called a forensic-DNA consultant, who testified that it was the serologist here who would have decided whether a particular bodily fluid like blood, semen, or saliva was present in a sample. The consultant also raised the expired-reagent problem in the lab's work and confirmed that this could have changed certain test results. She next pointed out chain-of-custody problems in the lab's paperwork—the records showed (a) that certain samples were tested before they were even received by the lab and (b) that the serologist neglected to make the kind of notes about how the lab received the samples that the consultant would consider to be standard practice. In both instances, the consultant thought the lab's work below standard and that it could subject the lab to an audit. The consultant noted still other problems with the lab's work: a contamination issue and an instance of having used the wrong quantitation program, both of which created wasted time and effort and required certain steps in the work to be redone. Finally, the consultant thought it unsurprising that Burford's DNA might be on Reedy's knife because the two men lived in the same house, the house was "unkept," and DNA can stay on an item for a long time.

Reedy also called the forensic psychologist / neuropsychologist who treated him. He opined that Reedy suffers from a mental disease or defect stemming from several problems. Because of the mental disease or defect, he thought it "possible" that Reedy would be unable to form intentional or knowing mental states and would instead be "reckless" in his conduct when an unimpaired person would otherwise be acting intentionally or knowingly. He noted Reedy's impairments in daily life and diagnosed him with mild neurocognitive disorder due to traumatic brain injury, vascular risk factors affecting the flow of blood and oxygen to the brain, chronic effects of alcohol, unspecified neurodevelopmental disorder, borderline intellectual functioning, specified trauma, stressor-related disorder, unspecified bipolar disorder, alcohol-use disorder / chronic alcohol dependency, and antisocial personality disorder.

7

Through interviewing and testing, the psychologist learned about a pediatric head injury of Reedy's; indications in his medical records of seizures; and many other conditions that compromise the flow of blood and oxygen to his brain, which slows processing speed and can undermine memory. Relatedly, Reedy is "not the greatest historian" and is "sometimes inconsistent," as with reporting memories. And his chronic alcohol dependence may also have affected his brain structure and function.

Reedy's test results put him in the third percentile for IQ and revealed "significant problems with reasoning and problem solving" and "attention," including that "he was not always correctly oriented, especially to date." His verbal comprehension is deficient and verbal skills significantly impaired, and he has a mildly impaired memory, struggles with social comprehension and judgment, has a severe impairment with following auditory commands and with auditory comprehension, and has impulse-control problems. The psychologist tested Reedy for malingering and concluded that Reedy was not trying to fake any symptoms to avoid criminal responsibility.

On cross-examination, the psychologist acknowledged that antisocial personality disorder, like Reedy's, involves violating others' rights. He also confirmed that Reedy was able to understand right from wrong. Finally, he admitted that by going out to rent DVDs and buy and drink alcohol on the day in question, Reedy was able to form intentional or knowing mental states to accomplish those acts.

To rebut the psychologist's testimony, the State called a court-appointed forensic psychologist, who evaluated Reedy's sanity. She opined that he was sane at the time of the alleged murder. He showed lucid memory of that day and reported planning rational behaviors like going to the library, taking the bus, and buying alcohol. She also saw evidence of feigning psychiatric symptoms but no evidence of malingering memory. She concluded that he does not suffer from

8

any mental disease or defect preventing him from (1) forming the intent to complete an act to fulfill a conscious desire of his or (2) knowing the likely result of any particular action of his.

After the close of the evidence, the trial court charged the jury on the offenses of both murder and manslaughter. After closing arguments and its deliberations, the jury found Reedy guilty of murdering Burford. This appeal followed.

## DISCUSSION

**I.      Admitting Sgt. Jones's opinion that Reedy was guilty did not reversibly harm him.**

In his first issue, Reedy contends that the trial court abused its discretion by allowing Sgt. Jones to opine on whether he was guilty of murder. This issue centers on the following exchange:

> Q. Have you had training and experience in classes to follow—to run an investigation, to collect evidence, and to be guided where that evidence takes you?
>
> A. Yes, sir. I've gone through many trainings on things as simple as interview interrogation to crime scene investigations. I do advanced homicide investigations.
>
> Q. Did you follow those protocols in this case?
>
> A. Yes, sir.
>
> Q. And when you looked at all the evidence that you reviewed—have you reviewed it multiple times, the evidence?
>
> A. Yes, sir.
>
> Q. Do you have any doubts in—
>
> [Defense counsel]: Your Honor, I'm going to object that it's the jury's job to determine what the facts reveal and not the detective[']s.
>
> The Court: It is the purview of the jury to decide what the evidence shows and to make a finding in this case[;] however, that does not prevent a witness from giving an opinion in the case. So you may give your opinion, ma'am.

9

Q. So in your opinion, based on your training and experience, do you believe you know who committed the murder of Mr. Burford?

A. Yes, sir.

Q. Who is that?

A. Mr. Charles Reedy.

The State argues that defense counsel did not preserve this issue for appellate review because the trial objection does not comport with the appellate complaint. The State says that the objection was about Sgt. Jones's "opinion on an issue to be decided by the trier of fact" but that the appellate complaint is instead about Sgt. Jones's "opinion as to [Reedy]'s guilt or innocence."

To preserve an evidentiary objection for appellate review, the complaining party must present the trial court with "a timely request, objection, or motion that . . . state[s] the grounds for the ruling that the complaining party s[eeks] from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context." *See* Tex. R. App. P. 33.1(a)(1)(A); *see also Russo v. State*, 228 S.W.3d 779, 796–97 (Tex. App.—Austin 2007, pet. ref'd) (requiring appellate complaints about admission of evidence to meet requirements of Rule of Appellate Procedure 33.1). This rule requires "the party complaining on appeal . . . about a trial court's admission, exclusion, or suppression of evidence" to, "at the earliest opportunity, have done everything necessary to bring to the judge's attention the evidence rule or statute in question and its precise application to the evidence in question." *Golliday v. State*, 560 S.W.3d 664, 669 (Tex. Crim. App. 2018). "The issue . . . is not whether the trial court's ruling is legally correct in every sense, but whether the complaining party on appeal brought to the trial court's attention the very complaint that party is now making on appeal." *Id.*

10

The State's preservation argument makes too fine a distinction of Reedy's objection. Even if, as the State says, the objection focused on opinion testimony about the "issue to be decided by the" jury, that issue was Reedy's guilt or innocence of murder. The objection followed on the heels of questions building to Sgt. Jones's opinion based on her having reviewed "all the evidence." In this context, the objection was specific enough to make the trial court aware that Reedy sought to prevent opinion testimony about whether "all the evidence" supported his guilt, which comports with his appellate complaint. *See* Tex. R. App. P. 33.1(a)(1)(A).

Similarly, the complaint to which the trial court's attention was drawn, *see Golliday*, 560 S.W.3d at 669, was whether Sgt. Jones could give *any* opinions based on her having reviewed all the evidence. The trial court overruled the objection by mentioning that witnesses are not prevented "from giving *an* opinion" (emphasis added) and let Sgt. Jones give her opinion, without qualification: "So you may give your opinion, ma'am." The State then asked her, and she gave, her opinion on Reedy's guilt. Because the trial court appeared to think that it was overruling an objection to *any* opinion testimony, its attention was brought to a complaint about Sgt. Jones potentially giving opinion testimony about guilt. *See id.* We therefore reject the State's preservation argument and continue to the merits of the issue.

On the merits, the parties raise competing lines of authority. Reedy relies on longstanding authority forbidding all witnesses, whether expert or lay and including law enforcement, from opining about guilt or innocence. *See Boyde v. State*, 513 S.W.2d 588, 590 (Tex. Crim. App. 1974); *Sandoval v. State*, 409 S.W.3d 259, 292 (Tex. App.—Austin 2013, no pet.); *DeLeon v. State*, 322 S.W.3d 375, 383 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd); *Huffman v. State*, 691 S.W.2d 726, 730 (Tex. App.—Austin 1985, no pet.) (per curiam). The State relies on longstanding authority allowing admission of opinion testimony even when it "embraces

11

an ultimate issue." Tex. R. Evid. 704; *see Ex parte Nailor*, 149 S.W.3d 125, 134–35 (Tex. Crim. App. 2004); *Fairow v. State*, 943 S.W.2d 895, 897 n.5 (Tex. Crim. App. 1997).

*Boyde* resolves any conflict between the competing lines of authority as applied here. The Court in *Boyde* treated the rule forbidding opinion testimony about guilt like an exception to the rule forbidding exclusion of testimony just because it embraces an ultimate issue:

> While this Court has recognized for all practical purposes, the invasion of the province of the jury rule is and has been long dead, it should be noted that the expression of guilt or innocence in this case was a conclusion to be reached by the jury based upon the instruction given them in the court's charge, coupled with the evidence admitted by the judge through the course of the trial. Thus, no witness was competent to voice an opinion as to guilt or innocence.

513 S.W.2d at 590 (internal quotations omitted). *Boyde* has not been overruled on this issue,[1] and courts continue to cite it for the rule forbidding opinion testimony about guilt. *See, e.g.*, *Viscaino v. State*, 513 S.W.3d 802, 812 (Tex. App.—El Paso 2017, no pet.); *Ex parte Skelton*, 434 S.W.3d 709, 724 (Tex. App.—San Antonio 2014, pet. ref'd); *Sandoval*, 409 S.W.3d at 292.

*Boyde*'s analysis also finds support in the plain language of Texas Rule of Evidence 704. The rule protects from exclusion a broad class of opinions—any opinion that simply "*embraces* an ultimate issue." *See* Tex. R. Evid. 704 (emphasis added). But an opinion may "embrace" an ultimate issue yet still fail to *answer* the ultimate issue of guilt. *See* Fed. R.

---

[1] *Boyde* might have been overruled on a different issue. Elsewhere in *Boyde*, the Court reviewed an issue about jury argument even though the appellant had not requested an instruction to disregard. *See Boyde v. State*, 513 S.W.2d 588, 591–92 (Tex. Crim. App. 1974). Some years later, the Court of Criminal Appeals required defendants to pursue objections about jury argument "to an adverse ruling" or else "forfeit[] [the] right to complain about the argument on appeal." *Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996). The Court "expressly overruled" "[a]ny prior cases to the contrary." *Id.* If *Boyde*'s analysis on the jury-argument topic was contrary to *Cockrell*, it is thus overruled, but that topic is not the one here: opinion testimony about guilt.

12

Evid. 704(a) (also using "embraces an ultimate issue"); *United States v. Duncan*, 42 F.3d 97, 102 (2d Cir. 1994) ("[T]he Agent did not comment as to whether Duncan was guilty of . . . the crimes with which Duncan was charged. He merely posited factual conclusions which are not prohibited even if they embrace an ultimate issue." (internal quotation omitted) (citing Fed. R. Evid. 704(a))); *United States v. Mohney*, 949 F.2d 1397, 1406 (6th Cir. 1991) (distinguishing inadmissible "opinion about whether appellant was guilty" from admissible "opinion regarding whether tax was due and owing for the years in question in order to assist the jury in determining a fact in issue" (citing Fed. R. Evid. 704(a))). Thus, the rule forbidding opinion testimony about guilt should control because it is more specific to opinion testimony about guilt than is the more-general rule forbidding exclusion of testimony just because it embraces an ultimate issue. *See* Tex. R. Evid. 101(d) ("Despite these rules, a court must admit or exclude evidence if required to do so by the United States or Texas Constitution, a federal or Texas statute, or a rule prescribed by the United States or Texas Supreme Court or the Texas Court of Criminal Appeals. If possible, a court should resolve by reasonable construction any inconsistency between these rules and applicable constitutional or statutory provisions or other rules."); *Dixon v. State*, 2 S.W.3d 263, 267 (Tex. Crim. App. 1998) ("The Rules of Evidence provide specific and general directives and are meant to work in conformity. Should an inconsistency arise, it should be removed by reasonable construction. Simply stated, general rules are not meant to super[s]ede specific rules."), *overruled on other grounds on reh'g*, 2 S.W.3d 263, 270–74 (Tex. Crim. App. 1999) (op. on reh'g).

Finally about the merits, we note that the State's cases do not address opinion testimony that a defendant was guilty. *See Nailor*, 149 S.W.3d at 134–35 (opinion that assault victim had not attacked defendant); *Fairow*, 943 S.W.2d at 897 (opinion about whether co-conspirator "accidentally" shot victim). In all, we conclude that the trial court abused its

discretion by overruling Reedy's objection and admitting the opinion that he was guilty of murder. *See Boyde*, 513 S.W.2d at 590; *Sandoval*, 409 S.W.3d at 292; *see also Viscaino*, 513 S.W.3d at 812 (holding that trial court abused its discretion by overruling objection to State's question, "I need you to tell me what your opinion is of—as to who took the money from the Clerk's Office").

To support reversal, the admission of the opinion about Reedy's guilt must have affected his substantial rights. *See* Tex. R. App. P. 44.2(b); *Sandoval*, 409 S.W.3d at 287. "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010); *accord Sandoval*, 409 S.W.3d at 287–88. "But if the improperly admitted evidence did not influence the jury or had but a slight effect upon its deliberations, such non-constitutional error is harmless." *Coble*, 330 S.W.3d at 280; *accord Sandoval*, 409 S.W.3d at 287. "In making a harm analysis, we examine the entire trial record," including the other evidence admitted, the jury instructions, the parties' theories of the case, closing arguments, and voir dire, "and calculate, as much as possible, the probable impact of the error upon the rest of the evidence." *See Coble*, 330 S.W.3d at 280; *Sandoval*, 409 S.W.3d at 288. We must "assess harm after reviewing the record, and the burden to demonstrate whether the appellant was harmed by a trial court error does not rest on either the appellant or the State." *Coble*, 330 S.W.3d at 280.

When analyzing harm under these standards, we remember that "each case must be examined on its own facts, taking into account the specific evidence and the probable impact of the erroneously admitted expert evidence upon the jury's decisionmaking in the particular case." *Id.* at 281. Five factors guide our analysis here: (1) whether "ample other evidence" supported Reedy's guilt; (2) whether "[t]he same basic" evidence as Sgt. Jones's opinion about his guilt "was admissible and admitted, without objection, through other" sources; (3) whether the admitted but

14

inadmissible opinion was "particularly powerful, certain, or strong"; (4) whether the opinion "was effectively rebutted and refuted" elsewhere; and (5) whether the State emphasized the opinion. *See id.* at 286–87; *Jessop v. State*, 368 S.W.3d 653, 678 (Tex. App.—Austin 2012, no pet.). If after the comprehensive review we are left with "'grave doubt' about whether the result of the trial was free from the substantial influence of the error," we must reverse. *Sandoval*, 409 S.W.3d at 288; *accord Barshaw v. State*, 342 S.W.3d 91, 94 (Tex. Crim. App. 2011). "'Grave doubt' means that in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *Barshaw*, 342 S.W.3d at 94 (internal quotation omitted).

Here, the first and second factors—ample other evidence of guilt and "[t]he same basic" evidence as Sgt. Jones's opinion about guilt admitted from other sources—are intertwined. Other, properly admitted evidence showed that Reedy placed himself in Burford's room with Burford just after he had gone to his own room and just before the latter died outside from the stab wound. Reedy said that the two men talked alone, though he changed that in his third interview, asserting that another person might also have been in Burford's small room. A trail of what the jury could reasonably conclude was blood connected Burford's room to his body at the bus stop, where Reedy was himself found by police. There was also apparent blood on Burford's door, and possibly in the bathroom sink, but nowhere else in the house. The lock-blade knife from Reedy's room, when tested, showed the likely presence of Burford's DNA on the blade in places corresponding to reddish brown stains. It also showed the likely presence of Reedy's DNA on the knife's handle. The possible blood on the sink and McGinnis's testimony about someone bounding upstairs before police arrived provided a basis for inferring what Reedy did with the knife after leaving Burford's room and putting it in his own. Other witnesses said that Reedy and Burford were quarrelling leading up to the latter's death, including Reedy twice threatening Burford. And

15

in the patrol car, Reedy's statements could reasonably be interpreted as an apology to Burford for killing him and a test-drive of the story—not my knife—that he might soon tell police. He opted instead for repeatedly and incorrectly asserting that Burford was shot.

We weigh all this evidence against possible gaps in the evidence of guilt. For example, there were no eyewitnesses to how Burford sustained his injuries, and the police, Reedy asserts, investigated no one else as a suspect. But these gaps do not undermine our conclusions from the other evidence—that it amply supported Reedy's guilt and that "[t]he same basic" evidence as Sgt. Jones's opinion about his guilt was properly admitted from other sources. *See Coble*, 330 S.W.3d at 286–87. The first two factors thus weigh against reversible harm. *See Barshaw*, 342 S.W.3d at 95–96 (noting that when improperly admitted opinion testimony concerns defendant's credibility against complainant's, evidence from other sources undermining defendant's credibility supports conclusion that admitting opinion was harmless).

Under the third factor, Sgt. Jones's opinion was certain and strong. She was asked if she knew who murdered Burford. The jury heard the trial court say that she could give her opinion. And she answered that it was Reedy. The third factor weighs in favor of reversible harm.

Under the fourth factor, we review Reedy's efforts elsewhere to rebut or refute the conclusion that he was guilty of murder. Among those efforts, his counsel cross-examined several witnesses to undermine the jury's confidence that police had the right man. His counsel elicited admissions that police never had McGinnis's knife, or any other, tested and never had the samples from Burford's hands and fingernails tested, even though Sgt. Jones thought it possible that Burford fought with his assailant and the medical examiner said that the samples could identify the assailant. Reedy's counsel ferreted out how it was unclear whether any officer was stationed at the back of the house when a witness reported that someone in a red cap ran through the nearby

16

alley and when another witness reported that someone had rattled the back fence. Investigators testified that they investigated those leads but that they did not go anywhere. Reedy's counsel also presented the psychologist's testimony to undermine any finding of the mental state required for murder, and the consultant's testimony to undermine the State's DNA evidence, and the jury could have believed or disbelieved that testimony. Finally, counsel juxtaposed the testimony that Burford's assailant would be expected to have Burford's blood on him or her against evidence that Reedy's white clothes remained unstained. Given all this, we find in the record effective rebuttal or refutation of Sgt. Jones's opinion that Reedy was guilty of murder here where no eyewitness saw how Burford was hurt. This factor therefore weighs against reversible harm.

Finally, under the fifth factor, the State only partially emphasized Sgt. Jones's opinion. It emphasized it by structuring her redirect examination to end with the opinion, ostensibly to make it the last word that the jury heard from her. But the State declined to emphasize the opinion in other ways. The trial court allowed re-cross-examination just after Sgt. Jones gave her opinion, but the State did not follow that with any further re-direct examination. And at no time during closing argument or rebuttal argument did the State mention Sgt. Jones's opinion. This final factor is therefore mixed about whether admitting the opinion reversibly harmed Reedy.

Based on our review under the factors used in *Coble*—three weighing against reversible harm, one in favor, and the other mixed—we are not left with "'grave doubt' about whether the result of the trial was free from the substantial influence of the error." *See Sandoval*, 409 S.W.3d at 288; *see also Barshaw*, 342 S.W.3d at 94. Although Reedy denied the murder and no witness saw him do it, there was still ample other evidence of his guilt, including from several sources besides Sgt. Jones. We are not "in virtual equipoise as to the harmlessness of the error," *see Barshaw*, 342 S.W.3d at 94, but instead conclude that admitting Sgt. Jones's opinion "had but

17

a slight effect upon" the jury's deliberations and therefore that Reedy was not reversibly harmed, *see Coble*, 330 S.W.3d at 280; *Sandoval*, 409 S.W.3d at 287. We hold that admitting the opinion about guilt was not reversibly harmful and thus overrule Reedy's first issue.

## II. The prosecutor's remark was not objectionable because it was a reasonable deduction from the evidence.

In his second issue, Reedy contends that the trial court abused its discretion by refusing to grant a mistrial when the prosecutor remarked during rebuttal argument that Burford's blood—not simply his DNA—was on the lock-blade knife. Reedy argues that there was no evidence that Burford's blood was on the knife, only potentially his DNA, and that it is not suspicious that his DNA was on it because he and Reedy were friends who socialized and lived together in the same unkept house.

The prosecutor was explaining during his rebuttal argument that no other knives were DNA-tested because much like "[w]hen you lose your cell phone and you look at different cell phones and find your cell phone, you stop looking." Likening that to this case, he then remarked, "When you get DNA back that says, yeah, the victim's blood is on the blade—," and Reedy's counsel objected. The trial court sustained the objection and instructed the jury to "disregard the last statement by" the prosecutor. But the court refused Reedy's request for a mistrial and then "remind[ed] the jury that [it is] the exclusive judges of the facts in this case" and that it "will remember the evidence as [the jury] heard it." The prosecutor then resumed his argument: "The victim's DNA is on the blade."

A mistrial is appropriate only "in extreme cases for a narrow class of highly prejudicial and incurable errors." *See Turner v. State*, 570 S.W.3d 250, 268 (Tex. Crim. App. 2018). We review a refusal to grant a mistrial for an abuse of discretion. *See Archie v. State*,

340 S.W.3d 734, 738–39 (Tex. Crim. App. 2011). We review the evidence in the light most favorable to the trial court's ruling and consider only those matters before the court when it ruled. *See Turner*, 570 S.W.3d at 268; *Carrasco v. State*, 154 S.W.3d 127, 129 (Tex. Crim. App. 2005); *Weatherred v. State*, 15 S.W.3d 540, 542–43 (Tex. Crim. App. 2000). The ruling must be upheld if it was within the zone of reasonable disagreement. *Turner*, 570 S.W.3d at 268. When reviewing for an abuse of discretion, we must affirm the trial court on any legal theory supported by the record, even if the theory is not one on which the trial court itself relied. *See State v. Esparza*, 413 S.W.3d 81, 85 & n.17 (Tex. Crim. App. 2013); *Carrasco*, 154 S.W.3d at 129; *Miles v. State*, 488 S.W.2d 790, 792 (Tex. Crim. App. 1972).

Jury argument is objectionable if it falls outside these categories of proper argument: (1) summary of evidence, (2) reasonable deduction from the evidence, (3) response to argument of opposing counsel, and (4) plea for law enforcement. *See Ex parte Lane*, 303 S.W.3d 702, 711–12 (Tex. Crim. App. 2009); *Lagrone v. State*, 942 S.W.2d 602, 619 (Tex. Crim. App. 1997). "Counsel is allowed wide latitude without limitation in drawing inferences from the evidence so long as the inferences drawn are reasonable, fair, legitimate, and offered in good faith." *Gaddis v. State*, 753 S.W.2d 396, 398 (Tex. Crim. App. 1988). Jury argument thus must be extreme or manifestly improper, or must inject new and harmful facts into evidence, to constitute reversible error. *Id.*

The jury heard evidence that the lock-blade knife bore "unknown," "reddish/brown, rust colored" stains and saw pictures of the knife. It heard and saw evidence that a bloodletting event happened in Burford's room and that what looked like smears and a trail of blood led from his room to the bus stop. It heard that he died of a stab wound to the chest and had blood on his shirt and left arm. And it heard from the DNA analyst that she "believe[d]" that there was "blood

19

found on the evidence" tested by her lab, which includes the lock-blade knife. To be sure, Reedy elicited evidence tending to show that only the serologist, not the analyst, could say for sure whether there was blood on the knife. Still, the prosecutor's remark that Burford's blood was on it was a reasonable deduction from the evidence. *See Ex parte Lane*, 303 S.W.3d at 711–12; *Lagrone*, 942 S.W.2d at 619. The remark was not so extreme or manifestly improper, and did not inject new facts, so that the remark would support reversible error. *See Gaddis*, 753 S.W.2d at 398. Even though the trial court thought the remark improper, the alternative legal theory that it was not objectionable at all is supported by the record and thus prevents us from holding the refusal to grant a mistrial to be an abuse of discretion. *See Esparza*, 413 S.W.3d at 85 & n.17; *Carrasco*, 154 S.W.3d at 129; *Miles*, 488 S.W.2d at 792. We hold that the trial court did not abuse its discretion by refusing a mistrial and thus overrule Reedy's second issue.

## CONCLUSION

We affirm the trial court's judgment.

_____

Chari L. Kelly, Justice

Before Chief Justice Byrne, Justices Baker and Kelly

Affirmed

Filed: June 23, 2021

Do Not Publish

20